**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Paul C. PERKINS, Defendant-Appellant.**

**No. 83–3566.**

United States Court of Appeals,
Eleventh Circuit.

Dec. 19, 1984.

John A. DeVault, III, Jacksonville, Fla., for defendant-appellant.

Thomas W. Turner, Asst. U.S. Atty., Orlando, Fla., for plaintiff-appellee.

Before KRAVITCH and HATCHETT, Circuit Judges, and HANCOCK,* District Judge.

KRAVITCH, Circuit Judge:

Appellant Paul C. Perkins was convicted of conspiracy to obstruct justice in violation of 18 U.S.C. § 371 [1] and obstruction of jus-

---

* Honorable James H. Hancock, U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. 18 U.S.C. § 371 states in relevant part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act

tice in violation of 18 U.S.C. § 1503.[2] Perkins appeals, claiming that the indictment was invalid, that the evidence was insufficient to support the jury's verdict, and that the trial court erred in denying him a new trial on the basis of jury misconduct. We find that, because of juror misconduct, appellant is entitled to a new trial; therefore, we reverse and remand.

## I. FACTUAL BACKGROUND

The Washington Shores Savings and Loan Association was organized in April, 1963. Paul Perkins and Charles Hawkins were among the bank's organizers. During the period relevant to this case, appellant Perkins was the bank's attorney and Charles Hawkins was its president.[3] Kaydette Hawkins, the wife of Charles Hawkins, had two brothers, John Wesley Hamilton and Ruye Berkley Hamilton. Their father's name was Ruye Marshall Hamilton.

On April 1, 1963, Ruye Marshall Hamilton opened an account at the Washington Shores Savings and Loan Association in the fictitious name of "Sweetie Marshall," a combination of his nickname "Sweetie" and his true middle name. The funds in the account were intended for Kaydette Hawkins. Ms. Hawkins signed a signature card when the account was opened and gave it to her husband to file at the bank. Transactions concerning this account were made in the following manner: Ruye Marshall Hamilton gave money to Kaydette Hawkins and this money was then deposited in the bank by Charles Hawkins; withdrawals were made by Kaydette Hawkins signing withdrawal slips and giving them to Charles Hawkins.[4] The first address listed on the ledger card for the account was the Hawkins' address. By February 1, 1974, the address on the ledger card was 647 West South Street, Orlando, Florida, the address of appellant Perkins' law office.

In January, 1979, Charles Hawkins discovered an unauthorized typed withdrawal of $23,464.47 from the Sweetie Marshall account, as well as similar questionable entries in several other accounts. Hawkins advised Perkins of the discrepancies, and the two of them asked an auditing firm to investigate. On May 31, 1979, Hawkins and Perkins notified the FBI of the problem. At that time, they met with Special Agent S.A. Wilkerson who began an investigation to identify the irregular accounts and to uncover any possible false entries and misapplication of funds.[5] Wilkerson obtained a grand jury subpoena which called for the production of certain records including those of the Sweetie Marshall account. Wilkerson went to 647 West South Street looking for Sweetie Marshall, but did not find him there. On March 12, 1980, Wilkerson was again in the neighborhood of 647 West South Street when he recognized Perkins on the street and asked him if he knew Sweetie Marshall. Wilkerson testified at trial that Perkins answered that "he knows of a Sweetie Marshall who is a middle-aged male. However, [Perkins

---

to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**2.** 18 U.S.C. § 1503 states:

Whoever corruptly, or by threats or force, or by threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duties, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on ac-

count of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

**3.** Charles Hawkins was initially the executive vice president of the bank and became president in the early 1970's.

**4.** At this time, Charles Hawkins did not know that the money in the account belonged to his wife, but rather, he believed that it belonged to Ruye Marshall Hamilton.

**5.** Ruye Marshall Hamilton was deceased by the time of this investigation.

stated] Sweetie Marshall does not reside at that address and he has not for some time." Perkins added that Sweetie Marshall resided in Polk County and that he would have him get in touch with the FBI. Perkins then helped Wilkerson locate another bank customer, Dr. Scanks, who lived and worked across the street from Perkins' office. At trial, Perkins testified that his statement about someone not residing at that address for some time, referred to where Dr. Scanks lived. He also testified that when he said he knew Sweetie Marshall he was referring to John Wesley Hamilton, Ruye Marshall Hamilton's son, who also was known by the nickname "Sweetie."

Following this encounter with Wilkerson, Perkins called Hawkins and related what had transpired. Perkins testified that Hawkins told him that the Sweetie Marshall account was not controlled by John Wesley Hamilton, but that another son, Ruye Berkley Hamilton of Tampa, had assumed control of the account since the senior Hamilton's death. Neither Perkins nor Hawkins called the FBI with this information although Hawkins had several subsequent contacts with Wilkerson.

In June, 1980, during a weekly family gathering, Charles Hawkins, Kaydette Hawkins, and Ruye Berkley Hamilton agreed that Ruye would pose as Sweetie Marshall in order for the money from the account to be reimbursed by the insurance company. A day or two later, on June 11, 1980, Perkins telephoned Ruye Berkley Hamilton and told him to call Wilkerson. Ruye Hamilton telephoned Wilkerson on June 12, 1980, and falsely identified himself as Sweetie Marshall. Perkins claimed at trial that the timing of the two calls was coincidental. He explained that he called Ruye Hamilton because Hawkins had told him that Ruye was in charge of the account and that he called at that particular time because nothing had been resolved and he wanted to get things moving in order to settle the matter with the insurance company. Ruye Hamilton and Perkins both testified that Perkins did not suggest to Hamilton that he represent himself as Sweetie Marshall.

In November of 1981, Assistant United States Attorney Leventhal issued grand jury subpoenas to the custodian of records of the Savings and Loan calling for the production of records, including those concerning the Sweetie Marshall account. Defendant Perkins delivered the records and testified before the grand jury.

On April 29, 1983, Perkins was indicted by the grand jury. Count One of the indictment charged Perkins and Charles Hawkins with participating in a conspiracy to obstruct justice which began on or about September 26, 1979 and continued to on or about February 2, 1983. The indictment listed three overt acts directly involving Perkins: a conversation between Perkins and FBI Special Agent Wilkerson on March 12, 1980; a telephone call placed by Perkins to Ruye Berkley Hamilton in June, 1980; and Perkins' testimony before the grand jury on November 19, 1981. Count Three [6] of the indictment charged Perkins with obstruction of justice through his testimony before the grand jury. Perkins had been questioned before the grand jury as to whether there were signature cards on the Sweetie Marshall account, whether his office received certain tax forms for the Sweetie Marshall account, and whether he knew Sweetie Marshall. In regard to this last avenue of inquiry, Perkins testified that he did not know Sweetie Marshall, but that he knew "of the person they say is Sweetie Marshall," that he had done legal work for the "one who's known as Sweetie Marshall," that Sweetie Marshall was a nickname and that "[Sweetie Marshall is] brown skinned, I would say approximately about five-eleven or six feet tall, something like that; and I would say that he weighs approximately 185 pounds, something like that." [7]

---

**6.** Count Two of the indictment concerned only Charles Hawkins.

**7.** The indictment, as pertinent to Perkins, states:

COUNT ONE

From on or about September 26, 1979 continuing to on or about February 2, 1983, in the Middle District of Florida,

CHARLES J. HAWKINS
and

PAUL C. PERKINS

wilfully and knowingly did conspire, combine, confederate, cooperate and agree together and with divers other persons both known and unknown to the Grand Jury to corruptly influence, obstruct, and impede and to endeavor to corruptly influence, obstruct and impede the due administration of justice, in violation of Title 18, United States Code, Section 1503 and in furtherance of such conspiracy and in order to effect the objects thereof, the defendants committed, among others, the following overt acts:

*Overt Acts*

(1) On or about September 26, 1979 Charles J. Hawkins received a Federal Grand Jury subpoena which commanded him to appear before the Grand Jury on September 28, 1979 and produce, in part, all records of the Washington Shores Federal Savings and Loan Association pertaining to account number 382 in the name of Sweetie Marshall, 647 West South Street, Orlando, Florida.

(2) On several occasions during the period from about September 1979 to about May 1980, Charles J. Hawkins advised Federal Bureau of Investigation Special Agent Roy Wilkerson that Hawkins would help locate Sweetie Marshall.

(3) On or about March 12, 1980 at 647 West South Street, Orlando, Florida, Paul C. Perkins told FBI Special Agent Roy Wilkerson that Sweetie Marshall did not reside at that address and had not for some time. Paul C. Perkins further advised FBI Special Agent Roy Wilkerson that Sweetie Marshall resided in Polk County and that Perkins would have Sweetie Marshall contact the FBI.

(5) During the course of the conspiracy, on a day the exact date of which is unknown to the Grand Jury, at Bartow, Florida, Charles J. Hawkins asked Ruye Hamilton to pretend to be Sweetie Marshall if contacted by the FBI. Hawkins told Hamilton to advise the FBI that he ("Sweetie Marshall") had not authorized any withdrawals from his ("Marshall's") account at the Washington Shores Federal Savings and Loan Association.

(6) On or about June 12, 1980, Paul C. Perkins provided the name Roy Wilkerson and Wilkerson's Orlando, Florida phone number to Ruye Hamilton.

(7) On or about June 12, 1980 Ruye Hamilton then placed a telephone call to the number Perkins had provided and talked with FBI Special Agent Roy Wilkerson. During that conversation Hamilton falsely represented to Agent Wilkerson that Hamilton's name was Sweetie Marshall. Hamilton then told Agent Wilkerson that he ("Sweetie Marshall") did not make a withdrawal from his ("Marshall's") account on July 28, 1978, nor did he ("Sweetie Marshall") authorize anyone else to make a withdrawal from his ("Marshall's") account at the Washington Shores Federal Savings and Loan Association.

(8) On or about November 19, 1981, Paul C. Perkins testified before the Federal Grand Jury at Orlando, Florida and stated under oath that he knew of the person "they say is Sweetie Marshall;" that he did legal work for the "one who's known as Sweetie Marshall;" and that Sweetie Marshall was a Negro male approximately 5'11" or 6' tall, weighing approximately 185 pounds.

All in violation of Title 18, United States Code, Section 371.

COUNT THREE

On or about November 19, 1981 in Orlando, Florida, in the Middle District of Florida,

PAUL C. PERKINS

did wilfully and, knowingly corruptly influence, obstruct and impede and did endeavor to corruptly influence, obstruct and impede the due administration of justice, to wit: an investigation by a duly empaneled Federal Grand Jury to determine whether there were violations of Title 18, United States Code, Sections 657 and 1006, in connection with the operation of the Washington Shores Federal Savings and Loan Association, Orlando, Florida; in that Paul C. Perkins in testimony under oath before such Grand Jury stated as follows:

Q. The next Subpoena that the bank received that you are responding to, is a Subpoena to the records custodian of Washington Shores Federal Savings and Loan Association to produce all original signature cards and original ledger cards since the inception of Sweetie Marshall and Willie Jacobs.

Do you have the ledger cards of those particular two accounts?

A. Yes.

Q. You do not have the signature cards, correct?

A. No, sir.

Q. You stated to me earlier when you came to the courthouse, that you had the ledger cards but there are no signature cards to these two accounts.

A. Yes.

Q. What you are giving me is ledger cards for the account of Sweetie Marshall and one for Willie Jacobs. Are those all the ledger cards at the bank, to those two accounts?

A. To my knowledge you have everything that was given to me.

Q. Why are there no signature cards associated with the two accounts?

A. When those accounts are checked by Mr. Leventhal and Mr. Smith, they will see that those accounts were started in 1963 and 1964. This is when we first started business, April 1963.

The reason why—and there are several others that there are no signature cards on because at that time, we only had a couple of people working there and we knew who the two people were, as far as those cards are concerned. And that is the reason why.

If they came there to make a withdrawal we knew the person. And that is my understanding why that there are no signature cards.

Q. What happened, if you were not at the bank one day or a new teller was there; how

The jury found Perkins guilty of both counts. The court sentenced Perkins to three years probation and fined him $5,000 on Count One, and imposed a three year probated sentence and a fine of $2,500 on Count Three. The two sentences were to run concurrently.

## II. VIABILITY OF THE INDICTMENT

■ Perkins claims that the indictment is fatally defective because it fails to contain all of the elements of the offenses charged. This issue was raised for the first time in a motion to dismiss made on the first day of the trial. Perkins correctly points out that Count One of the indictment fails to identify the judicial proceeding that Perkins allegedly conspired to obstruct and Count Three fails to allege how Perkins'

grand jury testimony obstructed justice. Although we find that the indictment was poorly drawn, we hold that neither of these omissions renders the indictment invalid; thus, the indictment is not subject to dismissal.

■ The validity of an indictment is determined "from reading the indictment as a whole and ... by practical, not technical considerations." *United States v. Markham*, 537 F.2d 187, 192 (5th Cir.1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977) (citations omitted).[8] "The test is not whether the indictment could have been framed in a more satisfactory manner but whether it conforms to minimal constitutional standards." *United States v. Haas*, 583 F.2d 216, 219 (5th

---

would she know it was Sweetie Marshall or Willie Jacobs that signed the withdrawal slip.

A. Normally Mr. Hawkins is there, at all times. And if he's not there, then Mr. Smith is there and they know—one of them knows them, either Mr. Smith or Mr. Hawkins. One of them is there at all times.

Q. Do you know Sweetie Marshall?

A. I don't know him; I know of the person that they say is Sweetie Marshall.

Q. Do you know Willie Jacobs?

A. No.

Q. On each one of these cards, on the top ledger card, there's an address for each of them at 647 West South Street, Orlando, Florida. That's your address, is it not?

A. Normally I'm at 305.

Q. That was your former address of your law office?

A. That's correct.

Q. Do you know why those addresses are on each account?

A. No.

Q. You didn't place them there?

A. No, I did not.

Q. Any 1099 that would have to go out from the bank showing interest posted each year, were they sent to your office?

A. The one was Sweetie Marshalls; I knew about that one. But, not Willie Jacobs.

Q. 1099s were sent to your office?

A. Yes.

Q. What did you do with them?

A. I think they just stayed there; I believe they did, at my office.

Q. You never forwarded them to Sweetie?

A. No, I don't think I did. I might have, but I don't recall right now, having done it.

Q. Why would you have received his mail?

A. It came there; my address was used. I did legal work for the one who's known as

Sweetie Marshall. I've done legal work for him.

Q. You have?

A. Yes.

Q. What kind of legal work?

A. There was a case of—the transferring of property was involved. Also, concerning the estate of his father, Mr. Hamilton. I handled the estate for them.

Q. Mr. Hamilton is the deceased father of Mr. Hawkins wife?

A. Yes.

Q. And you did work for Sweetie Marshall?

A. Yes.

Q. How did he get the name Marshall?

A. That was his nickname.

Q. Marshall?

A. Sweetie. They called him Sweetie Marshall; that was his nickname.

Q. Can you describe this man?

A. He's brown-skinned, I would say approximately about five-eleven or six feet tall, something like that; and I would say he weighs approximately 185 pounds, something like that.

Q. When you say dark-skinned, do you mean Negro?

A. Yes, sir.

Q. About how old?

A. I would say in his forties, late forties.

Q. You know this from having dealt with him?

A. Yes.

All in violation of Title 18, United States Code, Section 1503.

---

8. The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1788, 60 L.Ed.2d 240 (1979).[9] These standards are set out in *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974):

> Our prior cases indicate that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or a conviction in bar of future prosecutions for the same offense.

*Id.* at 117, 94 S.Ct. at 2907 (citations omitted). *See also United States v. Gold,* 743 F.2d 800 at 812 (11th Cir.1984).

■ Count One fails to state that the conspiracy to obstruct justice related to a grand jury investigation. Abundant case law supports the proposition that it is not necessary to allege in the conspiracy count all of the elements of the offense that is the object of the conspiracy with the same technical precision as would be necessary in a substantive count. *See, e.g., Wong Tai v. United States,* 273 U.S. 77, 81, 47 S.Ct. 300, 301, 71 L.Ed. 545 (1927); *United States v. Clark,* 649 F.2d 534, 539 (7th Cir.1981); *United States v. Cuesta,* 597 F.2d 903, 917 (5th Cir.), *cert. denied,* 444 U.S. 964, 100 S.Ct. 451, 62 L.Ed.2d 377 (1979). Appellant does not claim to have been misled at any time as to what proceeding allegedly was obstructed. The ambiguity arises because the overt acts listed refer to both the Grand Jury and the FBI investigations.[10] Such an ambiguity, however, will not render an indictment invalid. The Third Circuit dealt with a similar situation in *United States v. Shoup,* 608 F.2d 950 (3d Cir.1979). The *Shoup* indictment alleged that the defendants conspired to obstruct justice by "impairing, obstructing and impeding the lawful functions of the United States Department of Justice." *Id.* at 960. The case involved an investigation conducted by the United States Attorney's office and a Federal Grand Jury to determine the cause of widespread malfunctioning of voting machines. The court stated:

> We conclude that the failure of the indictment to allege specifically that Shoup conspired to impede a federal judicial investigation did not deny him his Fifth Amendment right to be indicted by a Grand Jury for this specific charge. The indicting grand jury found probable cause to believe that Shoup impeded the investigation conducted by the United States Attorney. The investigations by the United States Attorney and the Grand Jury into alleged voting fraud were conducted jointly. Our conclusion that, under these circumstances, obstruction of the United States Attorney's inquiry is equivalent to an impairment of the federal grand jury's investigation is a legal determination. Consequently, the interpretation of the indictment as sufficiently alleging that Shoup obstructed justice would not usurp the indicting Grand Jury's function of determining probable cause.
>
> Shoup also has been adequately informed of the nature of the charges against him as required by the Sixth Amendment. The indictment charged obstruction of justice, cited specifically to § 1503, and alleged that Shoup impeded the investigation conducted by the United States Attorney. Shoup was thereby apprised both of the acts on which the Grand Jury based its charge and that the prosecution had to prove that he conspired to obstruct the operations of the judicial body. Therefore, despite the less-than-perfect draftsmanship, the indictment gave Shoup sufficient notice of the nature of the charges to enable him to defend against them.

*Id.* at 960–961 (footnotes omitted). The appellant in the present case, like Shoup, was adequately advised of the nature of

9. U.S. Const. amend. VI states: "In all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation ...."

10. Appellant points out that obstruction of a criminal investigation conducted by an agency such as the FBI is not violative of 18 U.S.C. § 1503. *United States v. Simmons,* 591 F.2d 206, 208 (3d Cir.1979); *United States v. Ryan,* 455 F.2d 728, 733 (9th Cir.1972).

the proceeding that he was allegedly obstructing. Further, any ambiguity could have been clarified by requesting a bill of particulars. *United States v. Haas*, 583 F.2d at 221.[11]

Count Three does not state how Perkins' Grand Jury testimony obstructed justice nor does it label the testimony false and/or evasive. Perkins relies on *United States v. Griffin*, 589 F.2d 200 (5th Cir.), *cert. denied*, 444 U.S. 825, 100 S.Ct. 48, 62 L.Ed.2d 32 (1979), which states that "the government must, and in this case did, charge in the indictment and prove at trial that the testimony had the effect of impeding justice." *Id.* at 204. The *Griffin* court's statement was not intended to set out the prerequisite to a valid indictment under section 1503, but rather, referred to whether evasive and/or false testimony could constitute an obstruction of justice. As the government points out, a more instructive decision is *United States v. Haas*, 583 F.2d 216 (5th Cir.1978). In *Haas*, the indictment alleged that the defendant obstructed justice by communicating information to a grand juror, without specifying what information was communicated. The Fifth Circuit upheld the indictment, stating:

> Defendant contends, however, that the indictment fails to state what was communicated. While the bare allegation in the indictment of the communication of "information" is sufficient to withstand a motion to dismiss, it does not appear to meet fully the Government's obligation to permit a defendant to prepare a defense. In such a situation, a bill of particulars is an appropriate method of seeking such information. The function of a bill of particulars is to "cure omissions of details that might enable the defendant

to prepare his defense . . . ." *Norris v. United States*, 152 F.2d 808, 811 (5th Cir.), *cert. denied*, 328 U.S. 850, 66 S.Ct. 1118, 90 L.Ed. 1623 (1946).

*Id.* at 221. The present case is somewhat different in that the indictment states what Perkins said and that his statements obstructed justice, but not how the statements obstructed justice. Nevertheless, the indictment did adequately inform Perkins of the charges against him. He should have sought any clarification through a bill of particulars. Hence, we find this ground without merit.

## III. SUFFICIENCY OF THE EVIDENCE

 Appellant asserts that the evidence is insufficient to support the jury's verdict that he conspired to obstruct justice (Count One) and that he endeavored to obstruct justice (Count Three). In reviewing challenges to sufficiency of the evidence, this court must view the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and must affirm a conviction if a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. *United States v. Figueroa*, 720 F.2d 1239, 1243 (11th Cir.1983); *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982) (Unit B en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).[12] The evidence may be sufficient though it does not "exclude every reasonable hypothesis of innocence or [is not] wholly inconsistent with every conclusion of guilt . . . . A jury is free to choose among reasonable constructions of the evidence." *Bell*, 678 F.2d at 549.

---

**11.** Appellant also complains that the purpose of the grand jury investigation is omitted. We recognize that a statement of the Grand Jury's purpose would have aided Perkins in constructing his defense. We find, however, that a bill of particulars could have fulfilled this need.

　*Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) (indictment under 2 U.S.C. § 192 dismissed for failure to state the subject of the Congressional subcommittee inquiry), is not applicable to the present case. The dismissal in *Russell* was directly tied to the

Congressional delegation to the Grand Jury under 2 U.S.C. § 192 and the fact that "the very core of criminality under 2 U.S.C. § 192 is pertinency to the subject under inquiry of the questions which the defendant refused to answer." *Id.* at 764, 82 S.Ct. at 1047. *See also Hamling v. United States*, 418 U.S. at 118, 94 S.Ct. at 2908.

**12.** Decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981, are binding precedent in this circuit. *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982).

## A. *Conspiracy*

The elements of a conspiracy under 18 U.S.C. § 371 are: (1) an agreement between two or more persons, (2) an unlawful purpose, and (3) an overt act committed by one of the coconspirators in furtherance of the conspiracy. *United States v. Wieschenberg*, 604 F.2d 326, 331 (5th Cir.1979). The existence of a conspiracy may be established through direct evidence or through inference. As stated by this court in *United States v. Mulherin:*

> While mere presence or association with others involved in a criminal scheme is not sufficient to prove participation in a conspiracy, the essential elements of a conspiracy can be proved by inference from the actions of the parties or by circumstantial evidence. Direct evidence of an agreement to join a criminal conspiracy is rare, so a defendant's assent can be inferred from acts furthering the conspiracy's purpose. The government is not required to prove that each alleged conspirator knew all the details of the conspiracy; it is enough to establish that a defendant knew the essentials of the conspiracy.

710 F.2d 731, 738 (11th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 1305, 79 L.Ed.2d 703 (1984) (citations omitted).

In the present case, appellant contends that there was no conspiracy to obstruct the investigation of false entries or misapplication of funds (an investigation instigated by the appellant and Charles Hawkins); at most there was a conspiracy to defraud the insurance company or avoid paying taxes. We conclude, however, that a reasonable jury could have found that there was a conspiracy to obstruct the investigation of false entries to the extent that the conspirators did not want the FBI to learn who really controlled the account in question.

Perkins also claims that the government failed to prove that he agreed to be part of the conspiracy to keep the Grand Jury from learning the true circumstances of the ownership of the Sweetie Marshall account. At appellant's trial, the government produced the following circumstantial evidence of Perkins' involvement in the conspiracy: FBI Special Agent Wilkerson testified that on March 12, 1980, Perkins told him that Sweetie Marshall did not reside at 647 West South Street (Perkins' office address and the address listed on Sweetie Marshall's bank account), and had not "for some time," that Sweetie Marshall lived in Polk County, and that he would have Sweetie Marshall contact the FBI. When Perkins learned who controlled the Sweetie Marshall account (later in the day on March 12, 1980), he did not contact Wilkerson to clear the matter up. Perkins apparently took no further action until June 11, 1980, when he telephoned Ruye Hamilton and told him to call Wilkerson. This phone call took place several days after the Hamilton family had decided that Ruye would misrepresent himself as Sweetie Marshall in order to obtain the insurance money. The government also points to Perkins' alleged evasiveness or false statements before the Grand Jury as evidence that he was part of the conspiracy.

Although we find the foregoing evidence far from overwhelming, it is not this court's duty to conduct a plenary review of the evidence. Rather, under the standard set forth above, we find that the jury could have reasonably concluded that defendant knew of the conspiracy and agreed to be a part of it.

## B. *Obstruction of Justice*

The lower court instructed the jury that in order to convict Perkins of obstructing justice pursuant to 18 U.S.C. § 1503, the government must prove that there was a federal grand jury investigation underway, that the defendant endeavored to influence, obstruct, or impede justice, and that the defendant's acts were done knowingly and corruptly.

Appellant Perkins' answers before the Grand Jury have alternately been characterized by the government as evasive and as false. In *United States v. Griffin*, 589 F.2d 200 (5th Cir.1979), the Fifth Circuit held that false testimony can form the basis of a conviction under section 1503.

*Griffin* also held by implication, that evasive testimony can obstruct justice. *Id.* at 204 ("[w]hether Griffin's testimony is described in the indictment as 'evasive' because he deliberately concealed knowledge or 'false' because he blocked the flow of truthful information is immaterial."). The Second Circuit reached the same conclusion in *United States v. Cohn,* 452 F.2d 881 (2d Cir.1971), *cert. denied,* 405 U.S. 975, 92 S.Ct. 1196, 31 L.Ed.2d 249 (1972) (defendant charged with giving false and evasive testimony) where the court found "[t]he blatantly evasive witness achieves this effect [deliberate frustration] as surely by erecting a screen of feigned forgetfulness as one who burns files or induces a potential witness to absent himself." *Id.* at 884, citing *United States v. Alo,* 439 F.2d 751, 754, (2d Cir.), *cert. denied,* 404 U.S. 850, 92 S.Ct. 307, 30 L.Ed.2d 282 (1971). *See also United States v. Caron,* 551 F.Supp. 662, 667, n. 6 (E.D.Va.1982) ("[T]he indictment in *Griffin* alleges only that defendant gave false testimony, whereas in *Cohn,* the indictment additionally charged the defendant with giving evasive testimony, which more clearly obstructs a grand jury's investigation than does false testimony.").

Turning to the facts in the case before us, Perkins knew that there were irregularities in the Sweetie Marshall account, that "Sweetie Marshall" was a fictitious name, and that the grand jury was attempting to learn the identity of the person who controlled the Sweetie Marshall account. Although the government could have questioned Perkins more effectively, *e.g.,* by asking him directly who controlled the Sweetie Marshall account, a reasonable jury could have found that Perkins' answers were evasive or false in an effort to obstruct the grand jury's investigation. Although the evidence is marginal, we do not find that it would be unreasonable for the jury to conclude that appellant endeavored to influence, obstruct or impede justice and that his acts were done knowingly and corruptly.

▆ When false statements form the basis of the alleged obstruction, however, the government must prove that the statements had the effect of impeding justice.

*United States v. Griffin,* 589 F.2d at 205; *United States v. Caron,* 551 F.Supp. at 670. The Supreme Court's opinion in *In Re Michael,* 326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30 (1945), explains the rationale for this further requirement. There the Court explained:

All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth. Therefore, it cannot be denied that it tends to defeat the sole ultimate objective of a trial. It need not necessarily, however, obstruct or halt the judicial process. For the function of trial is to sift the truth from a mass of contradictory evidence, and to do so the factfinding tribunal must hear both truthful and false witnesses. It is in this sense, doubtless, that this Court spoke when it decided that perjury alone does not constitute an "obstruction" which justifies usurpation of the contempt power and that there "must be added to the essential elements of perjury under the general law the further element of obstruction to the Court in the performance of its duty." *Ex parte Hudgings, supra,* 249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656, 11 ALR 333.

326 U.S. at 227–28, 66 S.Ct. at 79–80. We find this rationale equally applicable to allegations of evasive testimony and thus conclude that when either false or evasive testimony is the basis of a section 1503 charge, the government must prove obstruction.

▆ We note, however, that the jury in this case was expressly instructed that it did not have to find the further element of obstruction in order to find the defendant guilty. Defense counsel did not object to this instruction at trial and does not challenge the validity of this instruction on appeal. Rather, appellant raises the requirement of proving obstruction only as it relates to whether there was sufficient evidence to support the jury's verdict. The government produced testimony that "the mystery of Sweetie Marshall" was not solved by Perkins' testimony and that the investigation continued for over a year af-

ter he testified. We find, based upon this evidence, that a reasonable jury could have found beyond a reasonable doubt that Perkins' testimony had the effect of obstructing the investigation. Thus, even given the incorrect jury instructions, Perkins' conviction is not subject to reversal based on insufficiency of the evidence. *Cf. United States v. Palzer,* 745 F.2d 1350 at 1355 n. 9, (11th Cir.1984). We are remanding this case for a new trial on other grounds and assume that the jury in this new trial will be correctly charged as to the necessity of finding the additional element of obstruction.

## IV. JUROR MISCONDUCT

### A. *Background*

On the morning of August 1, 1983, the federal district judge began the process of selecting juries for three criminal cases, including the *Perkins* case. In the presence of all the prospective jurors, the defendants, and their attorneys, the court began *voir dire* in the first case. Prospective jurors in this case were asked general questions by the trial judge, who instructed the remainder of the prospective jurors that they might also be called upon to answer these questions in the remaining cases. Included in these general questions were several which, in varying terms, asked prospective jurors whether:

they had ever been a plaintiff or a defendant in a civil law suit;

they were ever a witness in a civil or a criminal case;

they had ever been involved in anything where there was a question of misallocation of funds;

they had any close contact with law enforcement;

they had any bias or prejudice for or against the government or for or against the defendant.

*United States v. Perkins* was the last of the three cases for which jury members were chosen. The judge began the *voir dire* by reading the pertinent portions of the indictment. She then asked whether any of the jurors knew the defendant or the attorneys or knew anything about this case. Prospective juror Goad responded that he knew "[j]ust what I have read in the paper ...." Each of the potential jurors was instructed to give general information about himself or herself and to answer the "rest of the other questions" asked of the previous jurors. Prospective juror Goad stated:

> MR. GOAD: I have lived here since '46. I am a retired person. I was a bricklayer by trade. My wife worked. She is deceased for the past three years. Her work was part-time polygraph security work. Never—I know of no one in the law enforcement agencies. I have never been checked by the IRA, [*sic*] and I did have a fender-bender last year about this time.
>
> That's about it.

Goad became a juror in the case.

Presentation of the case began on August 2, 1983, shortly after 1:00 p.m. and recessed at 9:30 p.m. that evening. The trial reconvened at 7:30 a.m. the next morning and, at 5:05 p.m., the jury's deliberations began. At 9:00 p.m. the jury recessed until 9:00 a.m. the next morning, August 4th. At 12:25 p.m. on August 4, the jury advised the court by a note from the foreman that "[t]he Jury has come to a dead stalemate, and members of the Jury feel that they cannot change their minds on either charge." Appellant's motion for a mistrial was denied and the trial judge gave the jury a modified *Allen* charge. Jury deliberations proceeded, during the course of which appellant made two more motions for mistrial. At 8:25 p.m. on August 4, the jury returned its verdict of guilty on both counts.

Appellant filed post-trial motions for acquittal and for a new trial, together with affidavits stating that at 11:00 p.m. on the evening that the verdict was announced he received a telephone call from one juror and that two days later he received a call from another juror. Both jurors indicated that the verdict was not their verdict, that they had been pressured by the other jurors to vote for conviction, and that they succumbed to this pressure because they

were physically and mentally exhausted. One of the jurors also reported that a fellow juror who had been "especially committed to return a 'guilty' verdict" had said that he knew Paul Perkins and had served on "some committee" with him. In a subsequent call to appellant's counsel, this juror related that the juror who said that he knew Paul Perkins also said that he knew where Dr. Scanks lived and "took issue" with defendant's testimony on this matter. The two jurors sent letters to the trial judge expressing their belief that the verdict was not their verdict.

The trial judge held a post-trial hearing during which the jurors were questioned. The judge asked the jurors if any of them during *voir dire* had indicated that he or she knew the defendant. Juror Goad testified that he had stated during *voir dire* that he knew the "faces." The trial judge asked Goad "did you indicate on that occasion that you knew Mr. Perkins personally or just facially." He responded "facially." Eight of the eleven jurors then testified that Goad had made the statement that he knew Perkins personally and/or served on a committee with him and that he knew where Dr. Scanks lived.[13] Juror Goad then admitted to being on a committee with Perkins, but denied knowing him personally from this committee.

The trial judge then asked the jurors if any of them had been a plaintiff or a defendant in a civil suit. A number of the jurors indicated affirmatively and when one juror mentioned a divorce proceeding, juror Goad stated "[s]ince that counts, I was a principal in a divorce case about forty-two or three years ago." Juror Goad made no reference to other cases in which he had been a party. The trial judge subsequently read the style of *Snider v. Allstate Administrator Inc.*, (M.D.Fla., No. 69–237) *aff'd* 481 F.2d 387 (5th Cir.1973), *cert. denied*, 415 U.S. 957, 94 S.Ct. 1484, 39 L.Ed.2d 571 (1974) which included Goad as a defendant. The judge queried: "Mr. Goad, are you one of the defendants named in that law suit?" Goad replied, "[s]ince

you brought that up, I do remember that," but continued to disclaim knowledge of any of the particulars in that case. The trial judge continued:

THE COURT: Is there any other case that you can think about in which you have ever been involved in any way as a party or as a witness, Mr. Goad?

JUROR GOAD: No ma'am.

THE COURT: All right. Now, is that your present recollection today?

JUROR GOAD: That's my present recollection today; yes, ma'am.

THE COURT: Mr. Goad, if I were to mention to you the United States of America v. William Beck, would that ring any bells?

JUROR GOAD: Not really.

THE COURT: Do you know whether or not you were ever a witness for the government in that case of the United States v. William Beck?

JUROR GOAD: What did the case pertain to, ma'am? Maybe that would refresh. The name does not.

THE COURT: Okay. Do you recall whether or not you were ever a Government witness in a Federal court case? Let's pose it that way.

JUROR GOAD: No, I don't remember.

Toward the end of the hearing, the trial judge again asked Goad about his testimony in the *Beck* case:

THE COURT: Mr. Goad, in the case of the United States of America v. William Beck, if I were to tell you that this involved a charge against William Beck regarding the blowing up of the Carpenter's Union Hall, would that refresh your recollection?

JUROR GOAD: That would ring a bell, yes.

THE COURT: All right. Now, having rung that bell, what message do you get from that? Do you recall that situation?

JUROR GOAD: Vaguely.

---

**13.** Although the transcript is not perfectly clear, it appears that three jurors heard juror Goad say that he knew the defendant, five heard him say he had been on a committee with the defendant, and four heard him say that he knew where Dr. Scanks lived.

THE COURT: Were you a witness in that case for the Government?

JUROR GOAD: I was a witness in the case. I don't remember whether it was for Mr. Beck or other than Mr. Beck. I was a witness in that case, yes, ma'am.

THE COURT: Okay do you remember how long ago it was?

JUROR GOAD: No.

THE COURT: Do you remember anything else about it?

JUROR GOAD: No.

Following this questioning, the trial judge denied the motions for a new trial and acquittal.

Appellant Perkins alleges that there were two instances of juror misconduct in the course of his trial, each of which requires a new trial: (1) juror Goad withheld information during *voir dire;* (2) juror Goad injected extrinsic evidence into the jury's deliberations. We find merit in both claims.

B. *Non-Disclosure During Voir Dire*

The sixth amendment commands that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury ..." U.S.Const. amend. VI. This jury must be "capable and willing to decide the case solely on the evidence before it...." *Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). *Voir dire* protects this right "by exposing possible biases, both known and unknown, on the part of potential jurors." *McDonough Power Equipment, Inc. v. Greenwood,* — U.S. —, 104 S.Ct. 845, 849, 78 L.Ed.2d 663 (1984).

In the recent case of *McDonough Power Equipment Inc. v. Greenwood,* — U.S. —, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) the Supreme Court elaborated upon the standard for determining when juror responses at *voir dire* necessitate a new trial. *McDonough* was a products liability suit to recover damages sustained by plaintiff when his feet came into contact with a riding lawn mower manufactured by defendant. After the trial in which the jury found for the defendant, the plaintiff asked for a mistrial based on the failure of a juror to admit during *voir dire* that his son had been in a serious accident. The court of appeals held that, regardless of the juror's good faith in failing to respond correctly, a new trial was required. The Supreme Court reversed, finding that "[t]o invalidate the result of a three-week trial because of a juror's mistaken though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give." *Id.* 104 S.Ct. at 850. The Court stated:

> We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*Id.* 104 S.Ct. at 850.

Appellant claims, and the record shows, that juror Goad did not correctly answer *voir dire* questions concerning whether he knew the defendant and whether he had been involved in prior civil and criminal litigation. Thus, the first prong of the *McDonough* test requires a determination of whether juror Goad's answers were honest, that is, whether he was aware of the fact that his answers were false.

In the post-trial hearing on juror misconduct, the trial judge asked the jurors if any of them had stated during *voir dire* that he or she knew defendant Perkins. Goad replied that he had admitted during *voir dire* that he knew Perkins facially. The record does not reflect, however, that juror Goad admitted that he knew Perkins, facially or otherwise, during *voir dire.* It was only after eight of the jurors stated that Goad had said during jury deliberations that he knew Perkins or was on a committee with him, that Goad admitted that he had served on a committee with Perkins. Goad then told the trial judge that he did not remember this until after the trial had commenced

and at that point he "didn't attach any significance to it" and that he "never sat at any meeting with him, other than possibly the first gathering of the bi-racial committee." According to the government's construction of the facts, although juror Goad did not recall knowing Perkins or being on a committee with him during *voir dire*, he remembered this association during trial and jury deliberations, but then forgot about it again during the post-trial hearing until the testimony of his fellow jurors reminded him. We do not find this sequence credible.

Juror Goad also did not admit involvement in any prior criminal or civil cases during *voir dire*. During the post trial hearing, he eventually admitted involvement in two prior cases, but asserted that he had forgotten about them. In one case, *Snider v. Allstate Administrator, Inc.,* (M.D.Fla., No. 69–237) juror Goad had been a civil defendant charged with misappropriating union health and welfare funds. This case continued for six years and ended only ten years ago. Goad actively participated in the case by attending hearings, being deposed, testifying at trial, and signing affidavits. The second case, *United States v. Beck,* (M.D.Fla., Case No. 74–196), involving a dynamite bombing of the carpenters' union hall in 1974, received much publicity. Goad testified as a Government witness in the case, and his credibility was impeached by two character witnesses. Yet, juror Goad claimed that he forgot about both of these cases during *voir dire*.

The government's assertion that juror Goad's misstatements were honest mistakes is additionally undercut by Goad's responses during the post-trial hearing when the jurors were again asked about their experience with civil or criminal cases. Goad volunteered only his experience in obtaining a divorce some forty-two or forty-three years earlier. It was only after the trial judge read him the style of the *Snider* case and inquired whether he was the Don Goad named as a defendant, that juror Goad admitted his participation in

that case. Likewise, Goad disclaimed knowledge of *Beck* until the trial judge reminded him that the case involved the bombing of a union hall. He denied recalling the particulars of either case. This tenacious effort to deny involvement in the two cases is further evidence of juror Goad's lack of veracity. We thus conclude that the trial court's ruling that juror Goad did not make intentional misrepresentations during *voir dire* is clearly erroneous.

 We now turn to the second prong of the *McDonough* test: whether a correct response would have provided a valid basis for a challenge for cause. A party who seeks a new trial because of non-disclosure by a juror during *voir dire* must show actual bias. *United States v. Tutt,* 704 F.2d 1567, 1569 (11th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 174, 78 L.Ed.2d 156 (1983). Actual bias may be shown in two ways: "by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed." *United States v. Nell,* 526 F.2d 1223, 1229 (5th Cir.1976) (citations omitted).[14]

 There are numerous indications of juror Goad's bias. Goad's dishonesty, in and of itself, is a strong indication that he was not impartial. As stated by Justice Blackmun in his concurrence in *McDonough:*

> I agree with the Court that the proper inquiry in this case is whether defendant had the benefit of an impartial trier of fact. I also agree that in most cases, *the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial.*

104 S.Ct. at 850 (emphasis added). Moreover, the specific information that juror Goad concealed creates an additional inference of bias. A relationship between a juror and defendant, albeit a remote one, can form the basis of a challenge for cause. *Cf. United States v. Nell,* 526 F.2d 1223

---

**14.** The *Nell* court defines presumed bias as "situations in which the circumstances point so sharply to bias in a particular juror that even

his own denials must be discounted in ruling on a challenge for cause." 526 F.2d at 1229 n. 8.

(5th Cir.1976); *United States v. Bailey*, 468 F.2d 652, 658 (5th Cir.1972). Likewise, involvement in prior similar litigation may also be evidence of bias. *See United States v. Bynum*, 634 F.2d 768 (4th Cir. 1980) (juror in case involving conspiracy and making of a false statement had relatives who had been convicted of various offenses); *United States v. Eubanks*, 591 F.2d 513 (9th Cir.1979) (juror in drug case had two sons serving prison sentences for drug-related crimes); *Jackson v. United States*, 395 F.2d 615 (D.C.Cir.1968) (juror allegedly involved in a "love triangle" served in case where similar affair constituted motive for a murder). Goad had been a defendant in *Snider*, a case concerning misapplication of funds, which was also the underlying action in the present case. In addition, Perkins' defense relied on testimony of Perkins' good character, while in *Beck*, the criminal case, Goad's credibility was attacked by two character witnesses.

 Given the inferences of actual bias that arise from the fact that juror Goad felt compelled to misrepresent himself, the fact that he knew the defendant, and the fact that he had been involved in similar litigation, we conclude that actual bias must be presumed. As the Fifth Circuit stated in *United States v. Nell:* "Doubts about the existence of actual bias should be resolved against permitting the juror to serve, unless a prospective panelist's protestations of a purge of preconception is positive, not pallid." 526 F.2d at 1230. We agree with the Fourth Circuit that "[c]ertainly when possible non-objectivity is secreted and compounded by the untruthfulness of a potential juror's answer on *voir dire*, the result is deprivation of the defendant's right to a fair trial." *United States v. Bynum*, 634 F.2d at 771. The standard for reversing a trial court's determination of jury bias is "manifest abuse of discretion." *United States v. Tutt*, 704 F.2d at 1569; *United States v. Muller*, 698 F.2d 442, 444 (11th Cir.1983). We find that the trial court did so abuse its discretion in denying defendant's motion for a new trial on this ground.

## C. Interjection of Extraneous Prejudicial Information Into the Jury's Deliberations

In addition to failing to admit his knowledge of the defendant during *voir dire*, juror Goad used this knowledge during the jury's deliberations. Eight of the jurors who served with juror Goad testified at the post-trial hearing that Goad had stated during deliberations that he knew Perkins and/or that he had served on a committee with him. Several also stated that Goad had disputed Perkins' testimony as to where Dr. Scanks lived.

 The sixth amendment guarantee of a trial by jury requires the jury verdict to be based on the evidence produced at trial. *Turner v. State of Louisiana*, 379 U.S. 466, 472, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965); *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). This requirement "goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner*, 379 U.S. at 472, 85 S.Ct. at 549. Extrinsic evidence, evidence that has not been subject to the procedural safeguards of a fair trial, threatens such constitutional safeguards as the defendant's right of confrontation, of cross-examination, and of counsel. *Id.* at 473, 85 S.Ct. at 550. In addition, since such evidence has not been subject to the rules of evidence, it may confuse the jurors, *United States v. Howard*, 506 F.2d 865, 868 (5th Cir.1975); *Farese v. United States*, 428 F.2d 178, 180 (5th Cir.1970).

 When jurors consider extrinsic evidence, a new trial is required if the evidence poses a reasonable possibility of prejudice to the defendant. *See e.g., Howard*, 506 F.2d at 869; *Paz v. United States*, 462 F.2d 740, 745 (5th Cir.1972), *cert. denied*, 414 U.S. 820, 94 S.Ct. 47, 115, 38 L.Ed.2d 52 (1973); *Farese v. United States*, 428 F.2d at 180. Prejudice from extrinsic evidence is assumed in the form of a rebuttable presumption and the government bears the burden of demonstrating that the consideration of the evidence was harmless. *Howard*, 506 F.2d at 869. *See also*

*Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); *Richardson v. United States,* 360 F.2d 366, 369 (5th Cir.1966). Thus, beginning with the presumption that juror Goad's words were prejudicial, we look to whether that presumption has been rebutted.[15]

 Goad's remarks that he knew Perkins and/or had served on a committee with him were heard by eight of Goad's eleven co-jurors. These comments were made before a jury which for many hours had remained hopelessly deadlocked, and were made by a juror who was outspoken in his belief that Perkins should be convicted. The likelihood of prejudice on a jury is obvious. As stated in a similar case, *United States v. Blair,* 444 F.Supp. 1273 (D.D. C.1978) (jury reported overhearing one juror tell another that she knew codefendant):

> [The juror's] statement during the deliberations that she knew [the codefendant] on its face may appear to be quite general and innocuous. However, when the statement coupled with [the juror's] prior vote for conviction on Count Two, is examined in the context of the entire record in this case, the requisite prejudice is apparent. The court particularly takes note of the circumstantial nature of the Government's case.

*Id.* at 1276. *See also United States v. Howard,* 506 F.2d 865 (5th Cir.1975) (prejudice found where one juror mentioned that defendant had been in trouble two or three times before), *United States ex rel. Owen v. McMann,* 435 F.2d 813 (2d Cir.1970), *cert. denied,* 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971) (prejudice found where three jurors during deliberations alleged specific unfavorable incidents in the defendant's life).

Goad also stated that he knew where Dr. Scanks lived. At trial, Perkins testified that he did not tell FBI Special Agent Wilkerson on March 12, 1980 that Sweetie Marshall had not resided at the address that was now Perkins' office address; rather, Perkins alleged that he was referring to where Dr. Scanks currently lived. Wilkerson testified that Perkins' comments were directed toward where Sweetie Marshall lived. This conversation was one of the overt acts in the conspiracy charge. While the question of where Dr. Scanks actually lived at the time was not in dispute, information about where Dr. Scanks had lived in the past and whether he had moved could have implicated Perkins' credibility. Goad's asserted extrinsic knowledge might have allowed him to question Perkins' veracity. Thus, we find that the Government did not successfully rebut the presumption that the extrinsic evidence that Goad knew Perkins and that Goad knew where Dr. Scanks lived was prejudicial. The introduction of this evidence into the jury's deliberations also warrants a new trial.

For the foregoing reasons we REVERSE and REMAND for a new trial.

15. This court's inquiry into the jury's consideration of extrinsic evidence is limited by Federal Rules of Evidence 606(b) which provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any

outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

*See United States v. Badolato,* 710 F.2d 1509, 1515 (11th Cir.1983); *United States v. Howard,* 506 F.2d at 868–69 (evidentiary hearing before district court must be limited to objective demonstration of extrinsic factual matter disclosed in the jury room; the court is precluded from investigating the subjective effects of any breach on any jurors).