**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | No. 11-10669 |
| Plaintiff - Appellee, | D.C. No. 3:07-cr-00732-SI-1 |
| v. | |
| **BARRY LAMAR BONDS,** | **OPINION** |
| Defendant - Appellant. | |

Appeal from the United States District Court
for the Northern District of California
Susan Illston, Senior District Judge, Presiding

Argued and Submitted September 18, 2014
San Francisco, California

Before:  **REINHARDT, KOZINSKI, O'SCANNLAIN, GRABER,
WARDLAW, W. FLETCHER, RAWLINSON, CALLAHAN,
N.R. SMITH, NGUYEN** and **FRIEDLAND**, Circuit Judges.

**PER CURIAM**:

During a grand jury proceeding, defendant gave a rambling, non-responsive

answer to a simple question.  Because there is insufficient evidence that Statement

C was material, defendant's conviction for obstruction of justice in violation of 18

U.S.C. § 1503 is not supported by the record. Whatever section 1503's scope may be in other circumstances, defendant's conviction here must be reversed.

A reversal for insufficient evidence implicates defendant's right under the Double Jeopardy Clause. See United States v. Preston, 751 F.3d 1008, 1028 (9th Cir. 2014) (en banc) (citing Burks v. United States, 437 U.S. 1, 11 (1978)). His conviction and sentence must therefore be vacated, and he may not be tried again on that count.

**REVERSED.**

## COUNSEL

Dennis P. Riordan (argued) and Donald M. Horgan, Riordan & Horgan, San Francisco, California; Ted Sampsell Jones, William Mitchell College of Law, St. Paul, Minnesota, for Appellant.

Merry Jean Chan (argued), Assistant United States Attorney, Melinda Haag, United States Attorney, Barbara J. Valliere, Assistant United States Attorney, Chief, Appellate Division, United States Attorneys' Office, San Francisco, California, for Appellee.



United States v. Bonds, No. 11-10669:

**KOZINSKI**, Circuit Judge, with whom Circuit Judges **O'SCANNLAIN**, **GRABER**, **CALLAHAN** and **NGUYEN** join, concurring:

Can a single non-responsive answer by a grand jury witness support a conviction for obstruction of justice under 18 U.S.C. § 1503?

## I

Defendant, who was then a professional baseball player, was summoned before a grand jury and questioned for nearly three hours about his suspected use of steroids. He was subsequently charged with four counts of making false statements and one count of obstruction of justice, all based on his grand jury testimony. The jury convicted him on the obstruction count and was otherwise unable to reach a verdict.

The jury instructions identified seven of defendant's statements that the government alleged obstructed justice. The jury, however, found only one statement obstructive. That statement was referred to as Statement C at trial and is underlined in the passage below:

Q:  Did Greg[, your trainer,] ever give you anything that
    required a syringe to inject yourself with?

A:  I've only had one doctor touch me. And that's my only
    personal doctor. Greg, like I said, we don't get into each
    others' personal lives. We're friends, but I don't—we don't
    sit around and talk baseball, because he knows I don't want—

don't come to my house talking baseball.  If you want to come to my house and talk about fishing, some other stuff, we'll be good friends.  You come around talking about baseball, you go on.  I don't talk about his business.  You know what I mean?

Q:    Right.

A:    <u>That's what keeps our friendship.  You know, I am sorry, but that—you know, that—I was a celebrity child, not just in baseball by my own instincts.  I became a celebrity child with a famous father.  I just don't get into other people's business because of my father's situation, you see.</u>

Defendant was again asked about injectable steroids immediately following this exchange and a few other times during his testimony.  He provided direct responses to the follow-up questions.  For example, he was asked whether he ever "injected [him]self with anything that Greg . . . gave [him]."  He responded "I'm not that talented, no."  The government believed that those answers were false but, as noted, the jury failed to convict defendant on the false statement counts.

The district court rejected defendant's post-verdict motion for acquittal on the obstruction count and a three-judge panel affirmed.  <u>United States</u> v. <u>Bonds</u>, 730 F.3d 890 (9th Cir. 2013).  We granted en banc rehearing.  <u>United States</u> v. <u>Bonds</u>, 757 F.3d 994 (9th Cir. 2014).

**II**

**A.** Title 18 U.S.C. § 1503(a), which defendant was convicted of violating, provides in relevant part as follows: "Whoever . . . corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b)." Known as the omnibus clause, this language "was designed to proscribe all manner of corrupt methods of obstructing justice." United States v. Rasheed, 663 F.2d 843, 852 (9th Cir. 1981). We have held that a defendant "corruptly" obstructs justice if he acts "with the purpose of obstructing justice." Id.

As should be apparent, section 1503's coverage is vast. By its literal terms, it applies to all stages of the criminal and civil justice process, not just to conduct in the courtroom but also to trial preparation, discovery and pretrial motions. Indeed, it arguably covers conduct taken in anticipation that a civil or criminal case might be filed, such as tax planning, hiding assets or talking to police. And the text of the omnibus clause, in concert with our definition of corruptly, encompasses any act that a jury might infer was intended to "influence, obstruct, or impede . . . the due administration of justice." That's true even if no actual obstruction occurs, because the clause's use of "endeavors" makes "success . . . irrelevant." See

United States v. Richardson, 676 F.3d 491, 503 (5th Cir. 2012) (internal quotation marks omitted).

Stretched to its limits, section 1503 poses a significant hazard for everyone involved in our system of justice, because so much of what the adversary process calls for could be construed as obstruction. Did a tort plaintiff file a complaint seeking damages far in excess of what the jury ultimately awards? That could be viewed as corruptly endeavoring to "influence . . . the due administration of justice" by seeking to recover more than the claim deserves. So could any of the following behaviors that make up the bread and butter of litigation: filing an answer that denies liability for conduct that is ultimately adjudged wrongful or malicious; unsuccessfully filing (or opposing) a motion to dismiss or for summary judgment; seeking a continuance in order to inflict delay on the opposing party; frivolously taking an appeal or petitioning for certiorari—the list is endless. Witnesses would be particularly vulnerable because, as the Supreme Court has noted, "[u]nder the pressures and tensions of interrogation, it is not uncommon for the most earnest witnesses to give answers that are not entirely responsive." Bronston v. United States, 409 U.S. 352, 358 (1973).

Lawyers face the most pervasive threat under such a regime. Zealous advocacy sometimes calls for pushing back against an adversary's just case and

casting a despicable client in a favorable light, yet such conduct could be described as "endeavor[ing] to . . . impede . . . the due administration of justice."  Even routine advocacy provides ample occasion for stumbling into the heartland of the omnibus clause's sweeping coverage.  Oral arguments provide a ready example.  One need not spend much time in one of our courtrooms to hear lawyers dancing around questions from the bench rather than giving pithy, direct answers.  There is, for instance, the ever popular "but that is not <u>this</u> case" retort to a hypothetical, which could be construed as an effort to divert the court and thereby "influence . . . the due administration of justice."

It is true that any such maneuver would violate section 1503 only if it were done "corruptly."  But it is equally true that we have given "corruptly" such a broad construction that it does not meaningfully cabin the kind of conduct that is subject to prosecution.  As noted, we have held that a defendant acts "corruptly," as that term is used in section 1503, if he does so "with the purpose of obstructing justice."  <u>Rasheed</u>, 663 F.2d at 852.  In the examples above, a prosecutor could argue that a complaint was filed corruptly because it was designed to extort a nuisance settlement, or an answer was filed corruptly because its principal purpose was to pressure a needy plaintiff into an unjust settlement, or that the lawyer who parried a judicial hypothetical with "but that is not this case" was endeavoring to

distract the court so it would reach a wrong result. That a jury or a judge might not buy such an argument is neither here nor there; a criminal prosecution, even one that results in an acquittal, is a life-wrenching event. Nor does an acquittal wipe clean the suspicion that a guilty defendant got off on a technicality.

We have no doubt that United States Attorneys and their Assistants would use the power to prosecute for such crimes judiciously, but that is not the point. Making everyone who participates in our justice system a potential criminal defendant for conduct that is nothing more than the ordinary tug and pull of litigation risks chilling zealous advocacy. It also gives prosecutors the immense and unreviewable power to reward friends and punish enemies by prosecuting the latter and giving the former a pass. The perception that prosecutors have such a potent weapon in their arsenal, even if never used, may well dampen the fervor with which lawyers, particularly those representing criminal defendants, will discharge their duties. The amorphous nature of the statute is also at odds with the constitutional requirement that individuals have fair notice as to what conduct may be criminal. See United States v. JDT, 762 F.3d 984, 996 (9th Cir. 2014) (citing Skilling v. United States, 561 U.S. 358, 402–03 (2010)).

**B.**  Because the statute sweeps so broadly, due process calls for prudential limitations on the government's power to prosecute under it.  Such a limitation already exists in our case law interpreting section 1503: the requirement of materiality.  See United States v. Thomas, 612 F.3d 1107, 1128–29 (9th Cir. 2010).  Materiality screens out many of the statute's troubling applications by limiting convictions to those situations where an act "has a natural tendency to influence, or was capable of influencing, the decision of the decisionmaking body."  See Kungys v. United States, 485 U.S. 759, 770 (1988) (internal quotation marks omitted); Thomas, 612 F.3d at 1124.  Put another way, the government must prove beyond a reasonable doubt that the charged conduct was capable of influencing a decisionmaking person or entity—for example, by causing it to cease its investigation, pursue different avenues of inquiry or reach a different outcome.  See United States v. McKenna, 327 F.3d 830, 840 (9th Cir. 2003) (finding statement material because it could have affected the "decision-making process"); Weinstock v. United States, 231 F.2d 699, 703 (D.C. Cir. 1956) (noting that, to be material, a statement "must have some weight in the process of reaching a decision").

In weighing materiality, we consider "the intrinsic capabilities of the . . . statement itself," rather than the statement's actual effect on the decisionmaker, see

United States v. Serv. Deli Inc., 151 F.3d 938, 941 (9th Cir. 1998) (internal

quotation marks omitted), and we evaluate the statement in "the context in which

[it was] made," United States v. Rigas, 490 F.3d 208, 231 (2d Cir. 2007); see also

United States v. McBane, 433 F.3d 344, 352 (3d Cir. 2005); Weinstock, 231 F.2d

at 703 (noting that in context, a statement was "rob[bed] . . . of any

materiality—any possible influence upon the [decisionmaker] in reaching its

decision").

We start with the self-evident proposition that Statement C, standing alone,

did not have the capacity to divert the government from its investigation or

influence the grand jury's decision whether to indict anyone.  Here it is again:

> That's what keeps our friendship.  You know, I am sorry, but that—
> you know, that—I was a celebrity child, not just in baseball by my
> own instincts.  I became a celebrity child with a famous father.  I just
> don't get into other people's business because of my father's situation,
> you see.

The statement says absolutely nothing pertinent to the subject of the grand jury's

investigation.  Even when paired with the question that prompted it,

> Did Greg ever give you anything that required a syringe to inject
> yourself with?

Statement C communicates nothing of value or detriment to the investigation.  Had

the answer been "I'm afraid of needles," it would have been plausible to infer an

unspoken denial, with the actual words serving as an explanation or elaboration. But, as given, the answer did not enlighten, obfuscate, confirm or deny anything within the scope of the question posed.

The most one can say about this statement is that it was non-responsive and thereby impeded the investigation to a small degree by wasting the grand jury's time and trying the prosecutors' patience. But real-life witness examinations, unlike those in movies and on television, invariably are littered with non-responsive and irrelevant answers. This happens when the speaker doesn't understand the question, begins to talk before thinking (lawyers do this with surprising frequency), wants to avoid giving a direct answer (ditto), or is temporizing. Courtrooms are pressure-laden environments and a certain number of non-responsive or irrelevant statements can be expected as part of the give-and-take of courtroom discourse. Because some non-responsive answers are among the road hazards of witness examination, any one such statement is not, standing alone, "capable of influencing . . . the decision of [a] decisionmaking body." See Thomas, 612 F.3d at 1124.

This is true even if, as the government now argues, Statement C is literally false. An irrelevant or wholly non-responsive answer says nothing germane to the subject of the investigation, whether it's true or false. For example, if a witness is

asked, "Do you own a gun?" it makes no difference whether he answers "The sky is blue" or "The sky is green." That the second statement is false makes it no more likely to impede the investigation than the first.

Statement C does not, however, stand alone. It was a small portion of a much longer examination, and we must look at the record as a whole to determine whether a rational trier of fact could have found the statement capable of influencing the grand jury's investigation, in light of defendant's entire grand jury testimony. If, for example, a witness engages in a pattern of irrelevant statements, or launches into lengthy disquisitions that are clearly designed to waste time and preclude the questioner from continuing his examination, the jury could find that the witness's behavior was capable of having some sway.

On careful review of the record, we find insufficient evidence to render Statement C material. In conducting this review, we are mindful that we must give the jury the benefit of the doubt and draw all reasonable inferences in favor of its verdict. See Jackson v. Virginia, 443 U.S. 307, 319 (1979). At the same time, we must conduct our review with some rigor for the prudential reasons discussed above. See pp. 3–8 supra.

The government charged a total of seven statements, only one of which the jury found to be obstructive. Two of these statements (including Statement C)

appear to be wholly irrelevant—verbal detours with no bearing on the proceedings. One statement is "I don't know," followed by a brief explanation for the lack of knowledge. The rest are direct answers that the government claimed were false, all concerning whether defendant's trainer had provided or injected him with steroids. In the context of three hours of grand jury testimony, these six additional statements are insufficient to render the otherwise innocuous Statement C material. If this were enough to establish materiality, few witnesses or lawyers would be safe from prosecution.

APR 22 2015

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS



*United States v. Bonds*, No. 11-10669

N.R. SMITH, Circuit Judge, with whom Circuit Judges WARDLAW, CALLAHAN, and FRIEDLAND join, concurring::

I agree that no reasonable juror could have found Bonds guilty of violating 18 U.S.C. § 1503.

Bonds was convicted of obstructing justice by offering a "misleading or evasive" statement—Statement C—to the grand jury. The Government expressly declined to seek a conviction on the grounds that Statement C was false.[1] When evaluating whether the evidence was sufficient to show that Statement C violated § 1503, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard of review requires us to determine whether the jury could "draw reasonable inferences from basic facts to ultimate facts." *Id.* In this particular case, we must determine whether a single truthful but evasive or misleading answer could constitute evidence of obstruction of justice

---

[1] The Government asserts that, despite the position it argued to the jury, the evidence was sufficient to conclude that Statement C was literally false. The Government will not be allowed to change its position on appeal. *See McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991) ("Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.").

-1-

under § 1503. It cannot.

Section 1503(a) punishes those who "corruptly . . . influence, obstruct[], or impede[], or endeavor[] to influence, obstruct, or impede, the due administration of justice."[2] The Supreme Court has imposed a materiality requirement on the broad reach of § 1503, requiring that "the endeavor must have the natural and probable effect of interfering with the due administration of justice." *United States v. Aguilar*, 515 U.S. 593, 599 (1995) (internal quotation marks omitted). The Government is required to prove materiality to the jury. *United States v. Gaudin*, 515 U.S. 506, 511-12 (1995). The Supreme Court further instructs us, when

_____

[2] We need not accept Bonds's invitation to reassess the reach of § 1503. Doing so would require us to overturn the weight of Ninth Circuit precedent applying § 1503 to in-court testimony. *See United States v. Thomas*, 612 F.3d 1107 (9th Cir. 2010) (applying § 1503 to false statements made before a grand jury); *United States v. Gonzalez-Mares*, 752 F.2d 1485 (9th Cir. 1985) (applying § 1503 to false statement made before a magistrate judge); *United States v. Rasheed*, 663 F.2d 843 (9th Cir. 1981) (applying § 1503 to concealment of documents from grand jury). This approach would also bring us into conflict with other circuits that have applied § 1503 in the same manner. *See United States v. Petzold*, 788 F.2d 1478 (11th Cir. 1986) (applying § 1503 to grand jury testimony); *United States v. Griffin*, 589 F.2d 200 (5th Cir. 1979) (same); *United States v. Cohn*, 452 F.2d 881 (2d Cir. 1971) (same). Further, even if we were to consider Bonds's arguments that the legislative history of § 1503 limits the application of the statute, we would run up against the Supreme Court's decision in *Aguilar*, which implied that false testimony offered directly to a grand jury could support a conviction under § 1503. *United States v. Aguilar*, 515 U.S. 593, 601 (1995). Given our conclusion that Bonds's conviction cannot stand even if § 1503 reaches in-court testimony, we need not confront this issue.

dealing with the sweeping language of § 1503, to "exercise[] restraint in assessing the reach of a federal criminal statute . . . out of concern that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Aguilar*, 515 U.S. at 600 (internal quotation marks omitted).

1.

Congress could not have intended § 1503 to be so broadly applied as to reach a single truthful but evasive statement such as Statement C. Our conclusion that Statement C could not have "the natural and probable effect" of impeding the grand jury's investigative function stems from two sources: (1) the Government's duty to clarify merely misleading or evasive testimony and (2) relevant precedent indicating that the Government must show that truthful but misleading or evasive testimony must amount to a refusal to testify before it is material. Taken together, these two sources lead to the conclusion that a single truthful but evasive or misleading statement cannot satisfy § 1503's materiality requirement.[3]

---

[3]In coming to this conclusion, I do not mean to suggest that the materiality of Statement C turns on whether it was truthful. Because Statement C was obviously non-responsive, it could not have constituted obstruction even if it had been false. A witness who is asked about the location of key documents and responds "I am surprised it is raining" is not liable for obstruction regardless of whether it is raining. But if the same witness knows where the documents are and yet claims never to have heard of them, that potentially could be material and so

The Supreme Court's decision in *Bronston v. United States*, 409 U.S. 352 (1973), requires the conclusion that Statement C does not violate § 1503. Although *Bronston* dealt with a conviction for perjury, the Supreme Court's language regarding the government's duty to conduct competent and thorough questioning is illuminating. In short, "[t]he burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." *Id.* at 360. Extending § 1503's reach to transient evasive or misleading statements would obviate the prosecutor's duty to thoroughly examine the witness. *Id.* at 358 (noting that competent cross-examination should be conducted "by counsel alert–as every examiner ought to be–to the incongruity of [the witness's] unresponsive answer"). It would be contrary to the statute's purpose to allow the government to permit an evasive or misleading statement to go unchallenged, in the hopes of obtaining an obstruction of justice conviction later. The government is obligated to do all it can to obtain a direct statement in response to its questioning. The truth-seeking function of the grand jury may be impaired by lax questioning as much, if not more

could amount to obstruction. *See United States v. Williams*, 874 F.2d 968, 982 (5th Cir. 1989) (affirming obstruction of justice conviction based on repeated false denials of knowledge before a grand jury regarding material matters). The *Aguilar* standard applies to all conduct under § 1503. The truthfulness or falsity of a statement alone is not dispositive: the relevant inquiry will be whether the statement was material, applying the *Aguilar* standard.

than, an inarticulate or wandering answer.

*Bronston* counsels that, to convict a defendant for violating § 1503, the jury must find more than that the witness uttered an evasive or misleading statement at some point during his testimony—the "natural and probable effect" of a single truthful but evasive or misleading statement is merely to prompt follow-up questions. Given this burden, Statement C did not have the natural or probable effect of interfering with the due administration of justice, because the Government had a duty to clarify any single misleading or evasive statement Bonds made.

2.

The Supreme Court's materiality standard reinforces *Bronston*'s core holding: we should not find liability for a single statement that is merely misleading or evasive. The judicially-created materiality requirement is a primary objective limitation on § 1503's expansive reach. *See United States v. Thomas*, 612 F.3d 1107, 1128-29 (9th Cir. 2010). This materiality standard necessarily takes into account the context of the charged conduct, evaluating whether the misleading or evasive statement could have "the natural and probable effect of interfering with the due administrative of justice" given the entirety of a witness's examination. *Aguilar*, 515 US. at 599 (internal quotation marks omitted). The Government may not isolate a single statement, prove it misleading or evasive, and

argue that the statement is material based solely on that fact.

Evasive or misleading statements are different from false statements. Instead of providing the tribunal with bad information, information that can be evaluated for its capability to influence, a misleading or evasive statement is meant to divert or slow the truth-seeking function in the first instance; it does not so much influence an investigation as divert it by depriving the question of its force. In this sense, offering evasive or misleading testimony is closely analogous to the destruction of evidence. *See United States v. Rasheed*, 663 F.2d 843, 852 (9th Cir. 1981) ("the destruction or concealment of documents can fall within the prohibition of the statute" by "suppress[ing] evidence"). We should evaluate the materiality of evasive or misleading testimony the same way: for its capability to impede the investigative function of the grand jury.

The Fifth Circuit's explanation of the materiality standard in *United States v. Griffin* is particularly persuasive precedent. A false, misleading, or evasive statement may be material, taken in the context of the entire examination, when it amounts to "a flat refusal to testify." *United States v. Griffin*, 589 F.2d 200, 204 (5th Cir. 1979). Evasive or misleading testimony, in this light, can only obstruct the due administration of justice when it completely thwarts the investigative nature of the tribunal—when it derails the grand jury "as effectively as if [the

witness] refused to answer the question at all." *Id.* The proper question is not whether a statement had the intrinsic capability to influence the grand jury, but whether the statement, viewed in the context of the witness's testimony as a whole, "closed off *entirely* the avenue of inquiry being pursued by" the grand jury. *United States v. Brown*, 459 F.3d 509, 531 (5th Cir. 2006) (internal quotation marks omitted); *see also United States v. Cohn*, 452 F.2d 881, 884 (2d Cir. 1971) ("The blatantly evasive witness achieves th[e] effect [of impeding the gathering of relevant evidence] as surely by erecting a screen of feigned forgetfulness as one who burns files or induces a potential witness to absent himself.").

Applying the materiality standard a single truthful but evasive or misleading statement can never be material. Our examination of Statement C—a single evasive or misleading statement—reveals why. No rational juror could have found that Statement C amounted to a refusal to testify, such that Bonds's testimony thwarted the grand jury's investigative function.

In summary, the "natural and probable effect" of a single true but evasive response to the government's questioning is not to impede the grand jury but, rather, to prompt follow-up questioning. A statement that "goes off into the cosmos" merely triggers the prosecutor's duty to pin the witness down and elicit a clear response. Indeed, that is exactly what happened in this case. Faced with a

-7-

rambling response, the prosecutor restated the same question and elicited a direct, unambiguous answer from Bonds: "No." No rational juror could conclude that Bonds refused to answer the question; it is plain in the record that Bonds gave his testimony to the grand jury. Further, this is thus not a situation in which a witness testified evasively for so long and with such persistence that the grand jury's investigation would likely have been thwarted, as would be required for the testimony to be material. Statement C was therefore not material, and Bonds's conviction must be reversed.

*United States v. Bonds*, No. 11-10669

REINHARDT, Circuit Judge, concurring:

Because I concur not only with the per curiam opinion but also with parts of Judge Kozinski's and Judge N.R. Smith's opinions (while disagreeing with other parts), I offer my separate views regarding what is in a fact a very simple case, as well as my thoughts concerning the proper construction of 18 U.S.C. § 1503, the obstruction of justice statute.

## I.

My answer to the question with which Judge Kozinski begins his opinion, "Can a single non-responsive answer by a grand jury witness support a conviction for obstruction of justice under 18 U.S.C. § 1503?" is simple: No. My response would be the same regardless of the context in which the answer was given.

I reach the conclusion that Bonds's Statement C was not material and thus could not (and did not) obstruct justice on different and narrower grounds than does Judge Kozinksi. I do not agree, for example, with his opinion's sweeping statements regarding the scope of the statute or with its intimations that non-responsive answers that are not later cured by way of direct replies might constitute obstruction of justice. Similarly, I would not suggest that there may be a category of non-responsive or irrelevant answers that could be characterized as evasive or

1

misleading and thus subject to differing treatment from other kinds of non-responsive answers.

In my opinion, Statement C "cannot be said to have the 'natural and probable effect' of interfering with the due administration of justice.'" *United States v. Aguilar*, 515 U.S. 593, 601 (1995).[1] As Judge Kozinski himself puts it, "[it] says absolutely nothing pertinent to the subject of the grand jury's investigation." Kozinski Op. at 8. At most, Statement C was non-responsive, and in no respect could it (or did it) constitute a criminal act.

I concur with Judge Kozinski's opinion as well as Judge N.R. Smith's insofar as they state that Statement C could not have been material even if it had been false. A non-responsive answer that is false is "no more likely to impede the investigation than" a non-responsive answer that is true. Kozinski Op. at 10; *see also* N.R. Smith Op. at 3 n.3. Indeed, even "perjured *relevant* testimony . . . need not necessarily . . . obstruct or halt the judicial process." *In re Michael*, 326 U.S.224, 227–28 (1945) (emphasis added) (explaining that contempt for "obstruct[ing] the administration of justice," under predecessor statute to 18 U.S.C. § 401, required more than a false statement). I also agree heartily with Judge Kozinski's statements that "a certain number of non-responsive or irrelevant

---

[1] *See infra* p.3 and note 2.

2

statements can be expected as part of the give-and-take of courtroom discourse,"
and that we must consider the practicalities of "real-life witness examinations"
when interpreting the statute. Kozinski Op. at 9. Moreover, in my view the
appropriate course in the event of material false testimony is a perjury prosecution,
not a prosecution for obstruction of justice. In fact, the prosecutors tried to convict
Bonds of perjury on several counts in this very proceeding, but had no better luck
with the jury in that effort than they have had with this court on today's appeal.

Unlike Judge Kozinski, I concur with the part of Judge N.R. Smith's opinion
that would hold that the "natural and probable effect" test articulated in *United
States v. Aguilar* constitutes the proper standard for materiality with respect to
§ 1503.[2] I also concur with the part of Judge N.R. Smith's opinion that would hold
that under *Bronston v. United States*, 409 U.S. 352 (1973), the natural and probable
effect of Statement C is merely that counsel will have to ask follow-up questions.
Faced with a statement that is "unresponsive on [its] face," *id.* at 361, "[i]t is the
responsibility of the lawyer to probe; testimonial interrogation . . . is a probing,
prying, pressing form of inquiry. If a witness evades, it is the lawyer's
responsibility to recognize the evasion and to bring the witness back to the mark, to

---

[2] *Cf.* Kozinski Op. at 7 (describing materiality standard as whether conduct "has a natural tendency to influence, or was capable of influencing, the decision of the decisionmaking body" ).

3

flush out the whole truth with the tools of adversary examination." *Id.* at 358–59. In the instant case, the prosecutors did exactly that: they continued to press Bonds until he gave a direct answer.

The breadth of Judge Kozinski's opinion, its unwarranted speculation regarding context, and its use of *United States v. Thomas*, 612 F.3d 1107, 1124 (9th Cir. 2010), rather than *Aguilar*, 515 U.S. at 601, to define the materiality requirement prevent me from joining more of that opinion than I have. As to Judge N.R. Smith's opinion, I find it in several respects more persuasive than Judge Kozinski's, especially in its use of the *Aguilar* standard for materiality and its discussion of *Bronston*. However, in the end, I cannot join that opinion either, for several reasons. One, I disagree that a flat refusal to testify may be prosecuted under § 1503. Two, I do not agree that non-responsive answers are in any respect "closely related to the destruction of evidence." N.R. Smith Op. at 5. In my view, had Bonds refused to testify or continued to answer evasively, the appropriate course would have been a contempt proceeding, not an obstruction of justice prosecution. *See In re Grand Jury Proceedings, Ortloff*, 708 F.2d 1455, 1457–58 (9th Cir. 1983). Three, I do not agree with the unnecessary and, in my view, incorrect discussion of misleading or evasive testimony or with his implicit endorsement of *United States v. Griffin*, 589 F.2d 200 (5th Cir. 1979), as the proper

4

rule for this circuit. *See* N.R. Smith Op. at 5.

Many fundamental questions persist regarding the meaning and scope of § 1503, notwithstanding our court's broad construction of the statute in the past, *see generally United States v. Rasheed*, 663 F.2d 843 (9th Cir. 1981), and the Supreme Court's indication of a similar view in dictum in *Aguilar*, *see generally* 515 U.S. 593. Both Judge Kozinski's and Judge N.R. Smith's opinions have much to commend them. However, neither succeeds in its efforts to answer the critical questions regarding the purpose and role of the statute, in Judge N.R. Smith's case at least, partly because of currently conflicting circuit law that he may, understandably, be reluctant to overrule in light of the Supreme Court dictum in *Aguilar*. *See* N.R. Smith Op. at 2 n.2. Rather than attempting to resolve those problems in this case, however, I would simply hold that Bonds's answer in no way constitutes a violation of § 1503 because it is non-responsive and thus non-material, and that his prosecution for the charged offense was therefore wholly unwarranted under the law. I would leave the rest of the speculation and the unnecessary, if not erroneous, analysis in my colleagues' opinions to another time, preferably after the Supreme Court has spoken.

**II.**

My own view is that § 1503 should not be construed as covering testimony

5

of witnesses at court proceedings. I explain my reading of the statute only briefly in light of what appears to me to be the Supreme Court's current view of the law—a view that also causes me to refrain from suggesting at this time that we overrule Ninth Circuit cases that construe § 1503 overly broadly, *see Rasheed*, 663 F.2d at 851–52, or that apply it to in-court testimony. *See Thomas*, 612 F.3d at 1125–29. Although our court has previously affirmed a § 1503 conviction based on in-court testimony, *see id.*, the Supreme Court has never done so and has indicated its view only in dictum contained in *Aguilar*. *See* 515 U.S. at 600–01. Given the history and circumstances of § 1503, I would hope that the Court would not follow the *Aguilar* dictum when it confronts the issue directly.[3]

The history underlying § 1503 strongly supports the conclusion that in-court testimony is *not* a subject of criminal sanctions under that statute. The predecessor to § 1503 was originally enacted in 1831 in response to abuse of the contempt power by a federal district judge who had imprisoned a man for publishing a criticism of one of his opinions. *Nye v. United States*, 313 U.S. 33, 41 (1941). In

---

[3] In this respect my approach is somewhat less bold than Judge W. Fletcher's. I do not believe that we need confront the *Aguilar* dictum in order to reverse, so, as a prudential matter, I would not rely on the far broader ground discussed in this section of my concurrence. Nevertheless, should it become necessary in a future case to address the *Aguilar* dictum, I reserve the right to consider further the question of its binding nature.

establishing the crime of obstruction of justice, Congress created, as *Nye* put it, a "geographical" divide between the conduct constituting that crime and conduct subject to contempt: "misbehavior of any person or persons *in the presence of said courts, or so near thereto* as to obstruct the administration of justice" constituted contempt under section 1 of the Act of March 2, 1831, whereas persons *outside of court* who "corruptly, or by threats of force, obstruct, or impede, or endeavor to obstruct or impede, the due administration of justice" committed the crime of obstruction of justice under section 2. *Id.* at 46–49 (emphasis added). Section 1 survives today as 18 U.S.C. § 401, the contempt statute, while section 2 became the clause of § 1503 at issue in this case. Thus, the original understanding of the crime of obstruction of justice was that it applied to conduct *outside* the presence of a court. Such was and is the intent of Congress, and "[w]e cannot by process of interpretation obliterate the distinctions which Congress drew." *Nye*, 313 U.S. at 50.

When one considers the other criminal statutes available to punish in-court misbehavior by a witness—that is, misconduct during testimony—this "geographical" delineation, *id.* at 48, whereby only out-of-court conduct constitutes obstruction of justice under § 1503, makes sense. A false statement made during in-court testimony constitutes perjury. *See* 18 U.S.C. §§ 1621, 1623.

7

A failure to answer a question or a material evasion that the witness refuses to correct during in-court testimony constitutes contempt. I seriously doubt that the obstruction of justice statute was intended to duplicate these crimes. Something more than a witness merely lying or being non-responsive during testimony is required in order to violate § 1503. Otherwise, the crime of obstruction of justice would be to that extent wholly superfluous.

More important, the argument for coverage of such actions under § 1503 hinges entirely on the single word "corruptly." The other specified means of obstructing justice enumerated in that section—"by threats or force, or by any threatening letter or communication"—when viewed in context dictate the opposite conclusion: "corruptly" does not describe the in-court conduct of a witness, but rather, like those enumerated means, describes the conduct of a third party who seeks to obstruct the proceedings. The specified means necessarily describe the attempts of a third party to affect the judicial proceedings by corrupt means. As Judge W. Fletcher explains, the interpretative canon *noscitur a sociis*—literally "[i]t is known from its associates"—tells us that "the meaning of questionable or doubtful words or phrases in a statute may be ascertained by reference to the meaning of other words or phrases associated with it." Black's Law Dictionary 1060 (6th ed. 1990). Because obstructing proceedings by "threats or force" plainly

refers to the conduct of persons outside of court who seek to obstruct the proceedings and not to the witness who is testifying in court in the proceedings, "corruptly" must similarly be understood as referring to the means used by third parties to influence, obstruct, or impede proceedings, and not to in-court testimony by a witness who may well be the object but not the subject of the corrupt tactics.

Even if § 1503 covered in-court conduct, "corruptly" would, under the *noscitur a sociis* canon, as well as under any other reasonable means of statutory construction, require a greater magnitude of misconduct than simply giving a false or non-responsive answer to a question. Clearly, a mere lie or evasive answer is not akin to using threats or force to cause another to lie. Indeed, the Supreme Court has on occasion recognized that lies and evasive answers are part and parcel of the process of uncovering the truth through adversarial witness examination. *See Bronston*, 409 U.S. at 358; *Michael*, 326 U.S. at 227–28. The use of threats or force to impede a proceeding, by contrast, is not a customary incident of that process and constitutes a far more serious offense. "Corruptly" in the obstruction of justice statute covers conduct at the same level of obstruction as the use of threats or force and may not properly be interpreted so as to bring a mere lie or evasive answer by a witness within the scope of the statute. Although I am not certain that "corruptly" is limited to bribery as Judge W. Fletcher contends, I am

wholly confident that it does describe conduct of that magnitude and not a simple lie or evasive answer by a witness during in-court testimony.

For the reasons discussed above, I would hope that the Supreme Court would revisit its dictum in *Aguilar* and would conclude that § 1503 does not cover a witness's in-court testimony. After all, Congress has enacted criminal statutes other than § 1503 that sufficiently address a witness's in-court conduct. The problems created by the misuse of § 1503 by overeager prosecutors to punish witnesses for what they say in court are all too evident from the facts of this case. It is time for them to cease using that section as a substitute for vigorous cross-examination or for the criminal statutes that properly apply to in-court testimony.

\* \* \*

In short, this case involves nothing more than an irrelevant, rambling statement made by a witness during the course of a grand jury investigation. Statement C was not material and could not possibly have interfered with the due administration of justice. I therefore concur in the per curiam opinion (and the parts of Judge Kozinski's and Judge N.R. Smith's opinions that I have identified above). Bonds's conviction for obstruction of justice cannot stand and he may not be retried on the same charge.

*United States v. Bonds*, No. 11-10669

W. FLETCHER, Circuit Judge, concurring in the judgment:

I strongly but respectfully disagree with the rationale advanced by the per curiam opinion and by the principal concurrence.  I concur only in the judgment.

The issue before us is the meaning of the federal obstruction of justice statute, 18 U.S.C. § 1503(a).  Section 1503(a) provides, in relevant part:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States . . . or *corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice*, shall be punished as provided in subsection (b).

(Emphasis added.)  Section 1503(a) applies to obstruction of justice, as defined by the statute, in both criminal and civil proceedings.  Section 1503(b) provides punishments of varying severities, depending on the nature of the act.  The most lenient punishment is "imprisonment for not more than 10 years, a fine under this title, or both."  *Id.* § 1503(b)(3).

Bonds was prosecuted under the second, or "omnibus," clause of § 1503(a), the emphasized portion above.  The government and the principal concurrence read the word "corruptly" at the beginning of the clause to refer to a state of mind, meaning "with intent to influence, intimidate, or impede the due administration of

1

justice." They read the clause as criminalizing even entirely truthful statements, so long as those statements are made with such intent.

In the government's view, any truthful answer given in the course of civil or criminal litigation, if intended to influence, obstruct, or impede the administration of justice, violates the omnibus clause. At oral argument, the government made terrifyingly clear the result of its reading of the statute. The government contended that the obstruction statute criminalizes a truthful but intentionally evasive or misleading answer to an interrogatory in civil litigation. The government also contended that the statute criminalizes a truthful but intentionally evasive or misleading answer during appellate oral argument:

> Q: I think it's a common experience among all of us on the appellate court to ask of the lawyer in front of us in a criminal case that's come up on appeal: "Counsel, could you please explain to me what happened at trial?" and for the lawyer arguing from the U.S. Attorney's Office to say, "Your Honor, I was not the trial attorney." Now, sometimes that's an evasive answer. They may well know the answer, but it's true that they weren't the trial attorney. . . . Has the lawyer just committed a crime? . . . [T]he answer that I just hypothesized was designed to put me off the track. . . . A truthful but evasive answer.
> . . .
>
> A: I think that would be obstructive, Your Honor.

When asked how many San Francisco lawyers it planned to throw in jail, the government declined to specify.

2

The principal concurrence agrees with the government's reading of the statute. But it seeks to limit the scope of its operation, writing, "Because the statute sweeps so broadly, due process calls for prudential limitations on the government's power to prosecute under it." Concurrence at 7. According to the concurrence, "due process" and "prudence" dictate that a truthful but intentionally evasive or misleading statement can be prosecuted under the statute only if it was "material." *Id.* at 7–8. The concurrence defines "material" as "capable of influencing a decisionmaking person or entity." *Id.* at 8.

Applying its prudence-based definition of materiality, the principal concurrence tells us that Bonds's wandering and non-responsive answer was not material and therefore not criminal, even if given with intent to influence, obstruct, or impede. It concludes, "Statement C, standing alone, did not have the capacity to divert the government from its investigation or influence the grand jury's decision whether to indict anyone." *Id.* at 9. The concurrence contrasts Bonds's answer with an answer that would have been criminal. Bonds was asked, "Did Greg ever give you anything that required a syringe to inject yourself with?" If Bonds had answered "I'm afraid of needles," the concurrence tells us that he could have been successfully prosecuted. *Id.* If Bonds had given that answer, "it would have been plausible to infer an unspoken denial, with the actual words serving as an

3

explanation or elaboration." *Id.*

The principal concurrence's "prudential" narrowing of "the government's power to prosecute" is hardly reassuring. An attorney who provides a truthful but evasive answer to an interrogatory in civil litigation often does so in the hope that his answer will "influence the decisionmaking person" who receives it. If there is a reasonable chance that the hope will be realized, the attorney is a criminal. An appellate attorney who answers during oral argument, "I was not the trial attorney," sometimes knows what happened at trial but gives that answer in the hope that the judge will not pursue the matter. This attorney, too, may be a criminal.

I disagree. The omnibus clause of § 1503(a) is not an open-ended provision whose constitutionality we can uphold only by manufacturing a "prudential" limitation on the government's power to prosecute. Rather, it is a narrowly targeted provision that had a specific meaning when enacted and whose text has remained substantially unchanged for over 180 years. The key to a proper understanding of the statute is the meaning of the word "corruptly."

## I. Meaning of "Corruptly"

As used in § 1503(a), "corruptly" does not describe a state of mind. Rather, it describes a forbidden means of influencing, obstructing, or impeding the due administration of justice. As used in § 1503(a), "corruptly" most likely means "by

bribery." There are two arguments supporting this reading: first, the text of the statute; second, a comparison with 18 U.S.C. § 1621, the federal perjury statute.

## A. Text of the Statute

The predecessor to § 1503(a) was enacted in 1831, in reaction to perceived overreaching by a federal judge who had held a lawyer in contempt for an out-of-court writing. *See* Walter Nelles & Carol Weiss King, *Contempt by Publication in the United States: To the Federal Contempt Statute*, 28 Colum. L. Rev. 401, 423–31 (1928). The 1831 statute had two parts. The first described, and set limits on, the contempt power of federal judges. The second, at issue in this case, criminalized out-of-court conduct that improperly sought to influence judicial proceedings. Section 1503(a) is the successor to the second part.

The 1831 statute read, in relevant part:

> And be it further enacted, That if any person or persons shall, corruptly, or by threats or force, endeavor to influence, intimidate, or impede any juror, witness, or officer, in any court of the United States, in the discharge of his duty, or shall *corruptly, or by threats or force, obstruct or impede, or endeavor to obstruct or impede, the due administration of justice* therein, every person or persons, so offending, shall be liable to prosecution therefor . . . .

Act of Mar. 2, 1831, ch. 99, 4 Stat. 487, 488 (emphasis added). For convenience, I quote again the corresponding provisions of the modern § 1503(a):

> Whoever corruptly, or by threats or force, or by any threatening letter or

5

communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, . . . in the discharge of his duty . . . or *corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice*, shall be punished as provided in subsection (b).

18 U.S.C. § 1503(a) (emphasis added).  The omnibus clause, highlighted above, is at issue here.

There are three differences between the omnibus clause as originally enacted in 1831 and as it appears today.  First, in 1872, Congress enacted a provision that prohibited obstruction "by threatening letters, or any threatening communications," in addition to the 1831 prohibitions on obstruction "corruptly" and "by threats or force."  Act of June 10, 1872, ch. 420, 17 Stat. 378, 378.  As part of the general revision and codification of the federal criminal code in 1909, Congress simplified the statute by replacing "any threatening letters, or any threatening communications," with "any threatening letter or communication."  Act of Mar. 4, 1909, ch. 321, 35 Stat. 1088, 1113.  Second, the 1831 law prohibited obstructing or impeding the administration of justice.  The 1872 statute added a prohibition against influencing its administration.  Act of June 10, 1872, ch. 420, 17 Stat. 378, 378.  Third, as part of the 1909 revision, the comma after "corruptly" was dropped, almost certainly inadvertently.  Act of Mar. 4, 1909, ch. 321, 35 Stat. 1088, 1113.

6

There had been a comma after the word "corruptly" in both the first and omnibus clauses in the 1831 and 1872 statutes, and a comma was retained after "corruptly" in the first clause of the obstruction statute. *See* Act of Mar. 2, 1831, ch. 99, 4 Stat. 487, 488; Act of June 10, 1872, ch. 420, 17 Stat. 378, 378; Act of Mar. 4, 1909, ch. 321, 35 Stat. 1088, 1113. No reason was given in 1909 for dropping the comma after the word "corruptly" in the second, omnibus clause.

As written in 1831, the omnibus clause provided two methods, separated by commas, by which a person could improperly "obstruct or impede" the "due administration of justice." A person could do it "corruptly," or he could do it "by threats or force." As written in 1872, the clause provided three such methods, again separated by commas, by which a person could improperly "influence, obstruct, or impede" the "due administration of justice." A person could do it "corruptly," "by threats or force," or "by threatening letters, or any threatening communications." Finally, as revised and codified in 1909, the clause continued to provide three means, now partially separated by commas, by which a person could "influence, obstruct, or impede": a person could do it "corruptly," "by threats or force," or "by threatening letter or communication." The omnibus clause has remained essentially unchanged since the 1909 general revision and codification.

A "commonsensical interpretive principle" is that "words mean what they

7

conveyed to reasonable people at the time they were written." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Text* 15–16 (2012). The 1828 *American Dictionary of the English Language*, published three years before the enactment of the original version of § 1503(a), gave two definitions for corruptly:

> 1. In a corrupt manner; with corruption; viciously; wickedly; without integrity. We have dealt very corruptly against thee. Nehemiah 1.

> 2. By bribery. A judgment was obtained corruptly.

A contemporaneous document, as well as an interpretive canon, show that when it wrote the word "corruptly," Congress was likely using the narrow and specific second definition.

The *National Intelligencer*, publisher of the Register of Debates and the predecessor to what later became the *Congressional Record*, reported an action of the House of Representatives on the Senate Bill that became the 1831 statute. It reported that on Wednesday, March 2, 1831, the House amended and then agreed to the Senate Bill punishing "attempts to corrupt or intimidate jurors":

> The Senate's amendments to the Act declaratory of the powers of the Courts of the United States on the subject of Contempts; adding a second section for punishing all *attempts to corrupt or intimidate jurors*, &c. was amended on the suggestion of Mr. BUCHANAN, and then agreed to.

8

*Twenty-First Congress, Second Session*, Daily National Intelligencer, Mar. 3, 1831 (emphasis added). The reference is to the first clause rather than the omnibus clause of the statute, but there is no reason to believe that "corruptly" had different meanings in the two parallel clauses. The *National Intelligencer*'s use of the infinitive, "to corrupt," in connection with the direct object, "jurors," indicates that the prohibition against acting "corruptly" was a prohibition against a specific act — corrupting, or attempting to corrupt, jurors, and thereby obstructing or impeding justice. That is, the prohibition against acting "corruptly" was a narrow and specific prohibition against bribing jurors, using the second definition. It was not a broad general prohibition against acting "wickedly" or "viciously" in obstructing or impeding justice.

The text following the word "corruptly" in the omnibus clause of § 1503(a) reinforces the conclusion that it means "by bribery." In the current version, there are three specific forbidden methods of "influencing, obstructing, or impeding the due administration of justice": (1) "corruptly," (2) "by threats or force," or (3) "by any threatening letter or communication." In the 1831 version, there were two specific forbidden methods: (1) "corruptly," or (2) "by threats or force." Where statutory terms "are susceptible of multiple and wide-ranging meanings . . . those meanings are narrowed by the commonsense canon of *noscitur a sociis* — which

9

counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). "The maxim *noscitur a sociis*, . . . while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961); *see also United States v. Kimsey*, 668 F.3d 691, 701 (9th Cir. 2012) (even when an interpretation is conceivable "based on etymology alone," that definition is "severely undermined" when it is illogical in light of the neighboring statutory terms).

The text of the omnibus clause of § 1503(a) is precisely the kind of text to which the canon applies. Several methods of obstructing the administration of justice are listed immediately following the word "corruptly": "by threats," by "force," "by threatening letter," and by threatening "communication." These are not states of mind. They are specific methods of obstructing justice. We can read "corruptly" as describing a state of mind. Or we can read it as describing another specific method of "influencing, obstructing, or impeding" the "due administration of justice." The canon of *noscitur a sociis*, as well as common sense, instruct us to choose the latter.

Read in light of a contemporaneous dictionary meaning of "corruptly," in

light of the contemporaneous report on the bill that became the predecessor to §
1503(a), and in light of the *noscitur a sociis* canon, I conclude that § 1503(a)
forbids individuals from obstructing the administration of justice (1) by bribery, (2)
by threats or force, or (3) by any threatening letter or communication.

B.  Comparison to Perjury

A comparison of the federal obstruction of justice statute with the federal
perjury statute reinforces the conclusion that "corruptly" means "by bribery."  The
obstruction of justice statute prescribes different ranges of punishment depending
on the act.  The most lenient is "imprisonment for not more than 10 years, a fine
under this title, or both."  18 U.S.C. § 1503(b)(3).  The federal perjury statute, by
contrast, prescribes only one range of punishment.  It provides that someone found
guilty of perjury "shall . . . be fined under this title or imprisoned not more than
five years, or both."  18 U.S.C. § 1621.

If we accept the principal concurrence's reading of the word "corruptly," a
person who makes a material truthful statement with the intent to "influence,
obstruct, or impede the due administration of justice" may be punished by a term
of imprisonment of up to ten years.  A person who makes a material *untruthful*
statement with the same intent may be punished by a term of imprisonment of up
to only half that.  It makes no sense for Congress to punish a truthful statement

11

more severely than a lie. If, on the other hand, we accept that "corruptly" means "by bribery" in § 1503(a), the disparity in punishment makes perfect sense.

In *Bronston v. United States*, 409 U.S. 352 (1973), the Court explained the difference between truthful but misleading statements, on the one hand, and perjurious statements, on the other. The Court faced a question related to the question now before us: "whether a witness may be convicted of perjury for an answer, under oath, that is literally true but not responsive to the question asked and arguably misleading by negative implication." *Id.* at 352–53.

The government had charged Bronston with violating § 1621, the federal perjury statute, based on statements he had made at a hearing before a bankruptcy referee. When asked whether he had ever had any bank accounts in Swiss banks, Bronston replied that his "company had an account there for about six months, in Zurich." *Id.* at 354. Bronston did not mention that he had previously had a personal bank account in Geneva. *Id.* Bronston's answer was true. His company had indeed had an account in Zurich. However, his answer, while true, was designed to mislead the questioner. The United States successfully prosecuted Bronston for perjury on the theory that he had testified under oath "with literal truthfulness but unresponsively." *Id.* at 355. The Court reversed Bronston's conviction because "the federal perjury statute cannot be construed to sustain a

12

conviction based on [his] answer." *Id.* at 357.

The Court explained, "[W]e perceive no reason why Congress would intend the drastic sanction of a perjury prosecution to cure a testimonial mishap that could readily have been reached with a single additional question by counsel alert — as every examiner ought to be — to the incongruity of [Bronston]'s unresponsive answer." *Id.* at 358. "If a witness evades, it is the lawyer's responsibility to recognize the evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination." *Id.* at 358–59. This is so even when a witness's answers were "not guileless but were shrewdly calculated to evade." *Id.* at 362.

The Court rejected the very argument that the government makes in the case now before us:

> It is no answer to say that here the jury found that [the witness] intended to mislead his examiner. A jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner; the state of mind of the witness is relevant only to the extent that it bears on whether "he does not believe (his answer) to be true." To hold otherwise would be to inject a new and confusing element into the adversary testimonial system we know. Witnesses would be unsure of the extent of their responsibility for the misunderstandings and inadequacies of examiners, and might well fear having that responsibility tested by a jury under the vague rubric of "intent to mislead" or "perjury by implication." The seminal modern treatment of the history of the offense concludes that one consideration of policy overshadowed all others during the years

13

when perjury first emerged as a common-law offense: "that the measures taken against the offense must not be so severe as to discourage witnesses from appearing or testifying."

*Id.* at 359 (citation omitted). Simply put, "any special problems arising from the literally true but unresponsive answer are to be remedied through the 'questioner's acuity' and not by a federal perjury prosecution." *Id.* at 362.

The government and the principal concurrence brush *Bronston* aside. That is not so easily done, for the Court's reasoning is as applicable to this case as to Bronston's. In either case, "[a] jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner." *Id.* at 358. "To hold otherwise would be to inject a new and confusing element into the adversary testimonial system we know." *Id.* Further, and perhaps more important, if the concurrence is right about the meaning of "corruptly" in § 1503(a), the Court's careful parsing of the perjury statute in *Bronston* was wasted effort. If the concurrence is right, a prosecutor seeking to convict someone who may or may not have testified truthfully will never need to pursue a perjury conviction. The prosecutor can get an obstruction of justice conviction, carrying twice the penalty, for half the effort.

## II. *United States v. Aguilar*

Supreme Court dictum describing § 1503(a) does not change my conclusion.

14

In *United States v. Aguilar*, 515 U.S. 593 (1995), the Court reversed a conviction of U.S. District Judge Robert Aguilar for obstruction of justice in violation of the omnibus clause of § 1503(a). A grand jury had been investigating a conspiracy to influence another district judge. One of the suspected conspirators, Abe Chapman, was a distant relation of Aguilar. When Aguilar learned that Chapman had been named in a federal wiretap authorization, Aguilar warned him. During a subsequent grand jury investigation, FBI agents questioned Aguilar about his knowledge of the wiretap and the underlying conspiracy. Aguilar falsely stated that he did not know about either. His false statements provided the basis for his conviction under the omnibus clause.

The Supreme Court reversed the conviction because "[t]he action taken by the accused must be with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority." *Id.* at 599. "In other words, the endeavor must have the natural and probable effect of interfering with the due administration of justice." *Id.* (quotation marks omitted).

In dictum, the Court distinguished false statements made to an FBI agent from statements made directly to a grand jury. The Court assumed that such statements made to the grand jury would be covered by the omnibus clause. It

15

wrote that Aguilar's conduct "falls on the other side of the statutory line from that of one who delivers false documents or testimony to the grand jury itself. Conduct of the latter sort all but assures that the grand jury will consider the material in its deliberations." *Id.* at 601.

If I were compelled to treat the Court's dictum as a controlling statement of law, I would not be able to argue, consistent with the view of the Supreme Court, that the word "corruptly" in § 1503(a) means "by bribery." But I do not believe I am so compelled. "We do not treat considered dicta from the Supreme Court lightly," because "it serves as a prophecy of what that Court might hold." *McCalla v. Royal MacCabees Life Ins. Co.*, 369 F.3d 1128, 1132 (9th Cir. 2004) (quotation marks and citations omitted). But the Court has instructed that while "dictum 'may be followed if sufficiently persuasive,' it 'ought not to control the judgment in a subsequent suit.'" *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc) (quoting *Humphrey's Executor v. United States*, 295 U.S. 602, 627 (1935)).

I do not believe the Court's dictum in *Aguilar* was "considered" in the requisite sense. The question whether false statements made directly to the grand jury violate the omnibus clause was not before the Court. In his opposition to certiorari, Aguilar had conceded that, "as the government notes, the courts have

16

routinely applied Section 1503 to false testimony to the grand jury." Brief in Opposition at 18–19, *Aguilar*, 515 U.S. 593 (No. 94-270). The government highlighted that concession in its merits brief. Brief of Petitioner at 20, *Aguilar*, 515 U.S. 593 (No. 94-270) ("as respondent has conceded, 'the courts have routinely applied Section 1503 to false testimony to the grand jury.'"). In the context of his suit, Aguilar's concession makes sense, for it enabled him to focus his argument more narrowly, and to argue that even if the omnibus clause covered false statements made to a grand jury, his false statements to an FBI agent were not covered. The Court accepted without challenge the strategic concession that false statements to the grand jury were covered, and held that, even so, Aguilar's conduct fell outside the omnibus clause. The Court was thus not asked to consider the question whether false statements were covered by the omnibus clause because that question had been taken off the table. The question presented in the case now before us — whether truthful but evasive statements are covered by the omnibus clause — was so remote from the contemplation of the parties that there had been no need even to take it off the table.

No argument was made to the Court in *Aguilar* about the meaning of "corruptly" in 1831, when the obstruction of justice statute was enacted. Nor was any argument made to the Court about the disparity in sentencing between the

17

perjury statute and the obstruction of justice statute. Had the government sought a conviction under the omnibus clause based on a true but evasive or misleading statement to a grand jury, and had these arguments been presented to the Court, it is not at all clear that the Court would have read the statute as broadly as its dictum suggests.

It is possible that I am wrong and that I am required to regard the Court's dictum in *Aguilar* as controlling. I do not believe that this is so, but if it is I encourage the Court to revisit, either in this case or another, the question of the scope of the omnibus clause of § 1503(a). If the Court does revisit the question, I think it likely — perhaps very likely — that it will conclude, as I do, that the word "corruptly," as used in § 1503(a), means "by bribery."



*U.S. v. Bonds*, No. 11-10669
Rawlinson, Circuit Judge, dissenting:

There is no joy in this dissenting judge.  The *per curiam* and concurring

opinions have struck out.[1]

**Strike One - The *per curiam* and concurring opinions second-guess the**

**jury's verdict rather than deferring to it.**

I join the principal concurring opinion in its view that context matters in

determining whether sufficient evidence supports the conviction in this case.  *See*

*Kozinski Concurring Opinion*, p. 9.  A vital part of that context is the evidence

before the jury.  After all, it is that evidence we examine to determine whether any

reasonable juror could have convicted the defendant.  In doing so, we view the

evidence in the light *most* favorable to the prosecution.  *See Jackson v. Virginia*,

443 U.S. 307, 319 (1979); *see also United States v. Whittemore*, 776 F.3d 1074,

1078 (9th Cir. 2015).

Barry Bonds was convicted of one count of obstruction of justice in

violation of 18 U.S.C. § 1503.  That statute provides for the punishment of

"[w]hoever, corruptly . . . influences, obstructs, or impedes, or endeavors to

influence, obstruct, or impede the due administration of justice . . ."

---

[1]Apologies to Ernest Lawrence Thayer, *Casey at the Bat* (1888) ("But there
is no joy in Mudville–Mighty Casey has struck out.").

1

At the trial of this matter, the jurors were informed that the charges against Bonds stemmed from his appearance before a grand jury investigating steroid use by athletes. The obstruction of justice count alleged that Bonds gave "material Grand Jury testimony that was intentionally evasive, false, and misleading." Prior to his grand jury testimony, Bonds was granted immunity from prosecution if he complied with the immunity order. Special Agent Novitzky read the immunity order to the jury. The order provided in pertinent part:

> Barry Bonds may be called to testify before the grand jury; and

> In the judgment of the United States Attorney, the testimony and other information to be obtained from Barry Bonds is necessary to the public interest; and

> . . .

> It is therefore ordered that Barry Bonds, soon as he may be called, shall testify under oath and provide other information, including documents, in this case and in any further ancillary proceedings.

> It is further ordered that the testimony and other information compelled from Barry Bonds pursuant to this order . . . may not be used against him in any criminal case, except a prosecution for perjury, false declaration, or otherwise failing to comply with this order.

The purpose of immunizing a witness in exchange for his testimony is to ensure that the witness, freed from the specter of prosecution, will provide

2

complete and truthful testimony. *See United States v. Thomas*, 612 F.3d 1107, 1126 (9th Cir. 2010) (observing that "[t]he purpose of the immunity order in [the BALCO] case was to compel the witness to testify *truthfully and in good faith* before the grand jury to assist it in its investigation") (emphasis in the original). Giving evasive testimony is inconsistent with the obligation to provide complete and truthful testimony. *See United States v. Griffin*, 589 F.2d 200, 204 (5th Cir. 1979) ("[A]n obstruction of justice results when attempts to gather relevant evidence . . . are frustrated by the use of corrupt or false means. The blatantly evasive witness achieves this effect as surely by erecting a screen of feigned forgetfulness as one who burns files or induces a potential witness to absent himself.") (citation and internal quotation marks omitted). Hence, charges were brought against Bonds for obstruction of justice.

At trial, Special Agent Novitsky described the BALCO Laboratories investigation primarily involving the distribution of anabolic steroids. One of the principal targets of the criminal investigation was Greg Anderson, Bonds' fitness trainer. According to Agent Novitsky, execution of search warrants at BALCO Laboratories produced a "treasure [trove] of drugs and documents indicating usage and distribution [of anabolic steroids] to elite professional athletes." Authorities also found "physical evidence in terms of drugs that pertained to . . . steroid

3

distribution" following a search of Anderson's residence. Specifically, samples from Anderson's residence were revealed to be a "designer anabolic steroid." Authorities also recovered $60,000 from a safe in Anderson's residence and a bag of syringes in his vehicle.

It was against this backdrop that Bonds was immunized and brought before the grand jury to testify, with the grand jury process considered a continuation of the investigation. Bonds was not a target of the grand jury. Rather, he and other athletes were expected to testify candidly and truthfully to further the investigation into those who were the targets of the grand jury.

Agent Novitsky testified that the inconsistencies between Bonds' testimony and other evidence before the grand jury regarding the relationship between the athletes and the steroid distributors, including the evasions, required the investigators to conduct additional inquiries that would not have been necessary had Bonds given non-evasive testimony. We cannot say with certainty that no reasonable juror could conclude otherwise. Indeed, drawing all inferences in favor of the government, a reasonable juror could reasonably conclude that Bonds' evasive testimony diverted the investigation, thereby impeding the administration of justice. *See id.*

From the inception of this nation's system of justice, the jury has played an

integral role in the administration of justice. *See City of Morgantown, W.Va. v. Royal Ins. Co., Ltd.*, 337 U.S. 254, 258 (1949) (articulating that "[t]rial by jury is a vital and cherished right, integral in our judicial system"). We defer to the wisdom of twelve ordinary citizens, selected by the parties, who hear the evidence and follow the instructions given by the judge to reach a verdict. *See Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) ("Although the evidence presented at trial could yield an alternative inference, we must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts. . . .") (citation, alteration, and internal quotation marks omitted). Overturning a jury verdict, particularly on a sufficiency of evidence challenge, is rare, as it should be. *See United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). This "reviewing court may *not* ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt, only whether *any* rational trier of fact could have made that finding." *Id*. (citations and internal quotation marks omitted) (first emphasis added). Regrettably, little consideration is given in the *per curiam* and concurring opinions to the entirety of the evidence introduced during Bonds' trial. Indeed, the principal concurring opinion focuses on "the *instrinsic* capabilities of the statement itself," as determined on appeal. *Kozinski Concurring Opinion*, p. 7 (emphasis in

5

the original).  However, as discussed below, this analysis applies to false statements rather than to evasive statements.  Importing an inapplicable analysis to overturn the jury's considered verdict appears to be a means of "reach[ing] the conclusion that seems best" to my concurring colleagues. *Blue Cross & Blue Shield v. Rubin*, 490 F.3d 718, 724 (9th Cir. 2007) (citation omitted).  We know that the jury deliberated carefully because it convicted Bonds on only one of four charged counts.  *See United States v. Plunk*, 153 F.3d 1011, 1027 (9th Cir. 1998), *overruled on other grounds by United States v. Hankey*, 203 F.3d 1160, 1169 n.7 (9th Cir. 2000) (observing that "the fact that the jury rendered a mixed verdict . . . suggests that it reviewed the evidence rationally and independently") (citation, alterations, and internal quotation marks omitted).  Sufficient evidence supports the jury's considered verdict, and the verdict warrants deference rather than second-guessing.  *See Long*, 736 F.3d at 896.

When Bonds was asked before the grand jury if Anderson had ever given him anything that required a syringe to inject himself with (a yes or no question), Bonds launched into the following rambling soliloquy:

> I've only had one doctor touch me.  And that's my only
> personal doctor.  Greg, like I said, we don't get into each
> others' personal lives.  We're friends, but I don't–we
> don't sit around and talk baseball, because he knows I
> don't want–don't come to my house talking baseball.  If

6

you want to come to my house and talk about fishing, some other stuff, we'll be good friends.  You come around talking about baseball, you go on.  I don't talk about his business,  You know what I mean?

. . .

That's what keeps our friendship.  You know, I am sorry, but that–you know, that–I was a celebrity child, not just in baseball by my own instincts.  I became a celebrity child with a famous father.  I just don't get into other people's business because of my father's situation, you see.

This rambling, non-response answered the following unasked questions:

[Question:  How many doctors have touched (treated?) you?]

Answer:  I've only had one doctor touch me.  And that's my only personal doctor.

[Question:  Do you and Greg (Anderson) get into each others' personal lives?]

Answer:  Greg, like I said, we don't get into each others' personal lives.

[Question:  Do you and Anderson get into each others' professional lives?]

Answer:  We're friends, but I don't–we don't sit around and talk baseball, because he knows I don't want–don't come to my house talking baseball.  If you want to come to my house and talk about fishing, some other stuff, we'll be good friends.  You come around talking about baseball, you go on.  I don't talk about his business.

[Question:  What keeps your friendship with Anderson?]

7

Answer: That's [not getting into each other's personal or professional lives] what keeps our friendship.

[Question: Were you a celebrity child?]

Answer: You know, I am sorry, but that–you know, that–I was a celebrity child, not just in baseball by my own instincts. I became a celebrity child with a famous father. I just don't get into other people's business because of my father's situation, you see.

Despite these extended responses to unasked questions, Bonds studiously avoided answering the question that was actually asked: "Did [Anderson] ever give you anything that required a syringe to inject yourself with?"

The jury pondered Bonds' response in conjunction with Agent Novitsky's testimony that Bonds' response required the investigators to search for other evidence that Anderson provided steroids to Bonds. That evidence included testimony from other athletes who acknowledged receiving steroid injections, and from Steve Hoskins, Bonds' childhood best friend and personal assistant, who had discussions with Bonds about steroid injections and who heard Bonds complain about pain associated with the injections. Hoskins also witnessed Anderson and Bonds enter a bedroom "a couple of times" at Bonds' Arizona residence, with Anderson holding a needle that Hoskins believed was for steroid injections. Hoskins also recounted an incident when Anderson refused to inject Bonds and Bonds stated that he would "give it to himself." Hoskins testified that Bonds' shoe

8

size increased, his glove size changed, and his body got bigger, heavier and "a lot more muscular." During Hoskins' testimony, an audiotape was played that Hoskins made of Anderson discussing providing steroids to Bonds. Hoskins was growing increasingly concerned about Bonds' steroid use and wanted Bonds' father to intervene. Because Anderson and Bonds denied the use of steroids, Hoskins hoped to use the tape to convince Bonds' father that Hoskins' concern was justified. The tape was ultimately provided to investigating agents.

A former girlfriend of Bonds testified that Bonds revealed to her that a lump on Bonds' elbow was caused by steroid use. She also observed Anderson and Bonds regularly enter a bedroom in Bonds' Arizona residence with a satchel, locking the door after them and remaining inside for approximately twenty minutes. At the same time, the former girlfriend noted significant physical changes in Bonds, including a dramatic increase in size, acne on his upper shoulders and back, rapid hair loss, testicular atrophy, and decreased sexual performance. In addition, Bonds became "increasingly aggressive, irritable, agitated, very impatient, almost violent." The jury was informed by the Chief Science Officer of the United States Anti-Doping Agency that these are typical side effects of anabolic steroid use.

Finally, Kathy Hoskins, sister to Steve Hoskins, testified that she actually

witnessed Anderson administer a shot into Bonds' "bellybutton" with a syringe, "like the Doctor with a syringe in the bellybutton." According to Kathy Hoskins, Bonds commented that the injection was "a little some some, when I go on the road, you know we can't detect it, you can't catch it."

After hearing this evidence, the jury was instructed that to convict Bonds of obstructing justice, the government was required to prove beyond a reasonable doubt:

> 1. The defendant corruptly, that is, for the purpose of obstructing justice,
>
> 2. obstructed, influenced, or impeded, or endeavored to obstruct, influence, or impede the grand jury proceeding in which defendant testified,
>
> 3. by knowingly giving material testimony that was intentionally evasive, false or misleading.

The instruction on materiality informed the jury that:

> A statement was material if it had a natural tendency to influence or was capable of influencing a decision of the grand jury.
>
> The government alleges that the underlined portion of the following statements constitute material testimony that was intentionally evasive, false or misleading. In order for the defendant to be found guilty of count 5, you must all agree that one or more of the following statements was material and intentionally evasive, false or misleading, with all of you unanimously agreeing as to which statement or statements so qualify[.]

10

So instructed, the jury reasonably found that Bonds' rambling statement was evasive. Under the sufficiency of evidence standard, we draw all inferences in favor of the government when determining whether *any* rational juror could have found that Bonds' evasive testimony materially impeded the grand jury's performance of its investigatory function. *See Griffin*, 589 F.2d at 204; *see also United States v. Browning*, 630 F.2d 694, 699, 701 (10th Cir. 1980) ("The ultimate question . . . is not whether the defendant told the truth but whether the defendant obstructed or interfered with the process of truthfinding in an investigation . . . ").

Evidence may be sufficient to sustain a conviction under § 1503 even if "it does not exclude every reasonable hypothesis of innocence or is not wholly inconsistent with every conclusion of guilt [because] [a] jury is free to choose among reasonable constructions of the evidence." *United States v. Perkins*, 748 F.2d 1519, 1521 (11th Cir. 1984) (citation, alterations and internal quotation marks omitted).

The principal concurring opinion acknowledges that the sufficiency of evidence standard of review is a demanding one, but nevertheless elects to apply the standard with "some rigor." *Kozinski Concurring Opinion*, p. 10. Without citation to any precedent supporting the addition of "rigor" to the governing standard of review, that language sounds suspiciously close to a euphemism for

11

second-guessing the jury and "reach[ing] the conclusion that seems best" to those joining the principal concurrence. *Rubin*, 490 F.3d at 724 (citation omitted).

As the principal concurring opinion acknowledges, § 1503 sweeps broadly. *See Kozinski Concurring Opinion*, p. 3. Applying that broad statute to the facts of this case, we must determine whether there was sufficient evidence before the jury that Bonds sought to corruptly impede the work of the grand jury. *See id*. We are not called upon to determine how far § 1503 can be prudentially applied. Nor need we decide whether attorneys at oral argument could be prosecuted for giving evasive answers to questions from members of the oral argument panel. Such a discussion is more akin to resolving a claim that a statute is overbroad, an issue that is not before us in this appeal. In any event, a hypothetical overreach of the statute cannot affect Bonds' conviction for conduct that falls squarely within the statute. *See United States v. Jeter*, 775 F.2d 670, 679 (6th Cir. 1985) (concluding that 18 U.S.C. § 1503 was not vague or overbroad because "[t]he reach of the statute is clearly limited to such constitutionally unprotected and purportedly illicit activity as that undertaken by [the defendant] . . .").

The jury necessarily found that Bonds' evasive testimony was material because it was instructed that it had to make that finding before Bonds could be convicted of violating § 1503. Nevertheless, the principal concurring opinion

12

relies upon the "self-evident" proposition that Bonds' evasive statement "did not have the capacity to divert the government from its investigation . . ." *Kozinski Concurring Opinion*, p. 8.  But this conclusion ignores Agent Novitzky's testimony and the jury's finding of fact.  At a minimum, the jury's finding is supported by Agent Novitsky's testimony that Bonds' evasive responses diverted and impeded the investigation by requiring the investigators to determine whether Bonds was being injected with steroids unknowingly, and whether Bonds' inconsistent testimony compromised the testimony of the other witnesses.  *See Perkins*, 748 F.2d at 1528 (noting that "marginal" evidence is sufficient to support a conviction for obstruction of justice).  The jury chose "among reasonable constructions of the evidence," and we must respect that choice rather than second-guess it as the concurring opinions do.  *Id*. at 1526 (citation omitted).

**Strike Two - The *per curiam* and concurring opinions disregard precedent that supports upholding the jury's verdict.**

This is not the first time we have considered whether evasive testimony may serve as the basis for an obstruction of justice charge.  It may be the first time we have considered the statute as applied to a famous athlete.  But that should not be the deciding factor, and there is no other reason to interpret the statute differently in this case.

In *United States v. Rasheed*, 663 F.2d 843, 851 (9th Cir. 1981), we reiterated that the "obstruction of justice statute was designed to proscribe all manner of corrupt methods of obstructing justice. . . ." (citing *Catrino v. United States*, 176 F.2d 884, 887 (9th Cir. 1949)). In *Rasheed*, the defendant had destroyed or concealed subpoenaed documents, and we concluded that the suppression of documentary evidence violated the obstruction of justice statute as much as the suppression of testimonial evidence. *See id*. at 852. The defendant argued that when she appeared before the grand jury, she acknowledged that she had not produced all the subpoenaed documents. *See id*. at 853. She asserted that the government excused her from any further obligation of production, resulting in a lack of sufficient evidence to support a conviction for obstruction of justice. *See id*. We disagreed, holding that the obstruction of justice was complete when defendant directed destruction or concealment of the documents. *See id*. We clarified that the actions of the prosecutor "in no way negate[d] the commission of the crime. At best, [the prosecutor's] relieving [the defendant] of further production indicates that justice was not, in fact, obstructed. This is *not* a defense. . . ." *Id*. (emphasis added). We explained that once it was established that the defendant acted with "the intent to obstruct justice and endeavored to do so[,] [t]his is sufficient for guilt under section 1503. . . ." *Id*. The same analysis is

14

applicable to Bonds' evasive testimony. Once Bonds acted with the intent to evade giving the testimony that was compelled by the immunity order, the obstruction of justice offense was complete. *See id*. Even if Bonds eventually ceased his evasive efforts, his prior intent to obstruct was not negated. *See id*. Bonds' evasive testimony could and did interfere with the continued BALCO investigation as reflected in the testimony of Agent Novitsky. *See id*.; *see also Griffin*, 589 F.2d at 204 (observing that justice is obstructed "when attempts to gather relevant evidence . . . are frustrated by [a] blatantly evasive witness") (citation and internal quotation marks omitted).

Other circuits agree. *See United States v. Cohn*, 452 F.2d 881, 884 (2d Cir. 1972) (holding that "concealing data recorded in one's memory" through blatant evasion constitutes obstruction of justice); *see also United States v. Langella*, 776 F.2d 1078, 1081 (2d Cir. 1985) (describing "obviously evasive" answers as "concealment of evidence" within the scope of § 1503). In *Perkins*, 748 F.2d at 1528, the Eleventh Circuit similarly characterized the defendant's conduct as obstructive when he gave evasive answers before the grand jury. The Eleventh Circuit described the facts of the case as reflecting that the defendant knew there were irregularities in a certain bank account, that the account was held under a fictitious name, and that the grand jury was seeking to learn the true identity of the

account holder. Although the court acknowledged that the government could have questioned the defendant more effectively, it nonetheless held that a reasonable jury could have found that the defendant's evasive answers were intended to obstruct the grand jury's investigation. *See id*.

Ignoring these cases, in my view, creates an unwarranted circuit split and disregards our own precedent without justification.

**Strike Three - The concurring opinions rely on precedent more applicable to perjury than to obstruction of justice.**

The principal concurring opinion cites this language from *Bronston v. United States*, 409 U.S. 352, 358 (1973): "Under the pressures and tensions of interrogation, it is not uncommon for the most earnest witnesses to give answers that are not entirely responsive." *Kozinski Concurring Opinion*, p. 4. However, the cited language does not support a conclusion that there was insufficient evidence to support Bonds' conviction. In *Bronston*, the United States Supreme Court addressed the perjury statute, 18 U.S.C. § 1621 (not the obstruction of justice statute, 18 U.S.C. § 1503), and decided the issue of whether a witness may be convicted of perjury for giving an answer that is literally true, but non-responsive to the question asked. *See id*. at 352-53. There was absolutely no discussion of evasive testimony or obstruction of justice.

16

The defendant in *Bronston* answered several questions posed during adversarial bankruptcy proceedings concerning whether he or his company had Swiss bank accounts. *See id.* at 354. Although the defendant denied having Swiss bank accounts, there was evidence that the defendant had a personal bank account in a Swiss bank for a prior period of five years. *See id.* It was undisputed that the defendant's answers were literally truthful because the defendant did not have a Swiss bank account "at the time of questioning . . ." *Id.* In the context of a prosecution for perjury, the Supreme Court observed that "[t]he cases support petitioner's position that the *perjury statute* is not to be loosely construed, nor the statute invoked simply because a wily witness succeeds in derailing the questioner—so long as the witness speaks the literal truth. The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." *Id.* at 360 (citations omitted) (emphasis added).

There is a notable statutory distinction between the perjury at issue in *Bronston* and the obstruction of justice at issue in this case. In *Bronston*, the Supreme Court expressed its unwillingness to expand the perjury statute's reach to encompass literally truthful answers beyond the limits established by Congress. *See id.* at 358. In its current form, the perjury statute, 18 U.S.C. § 1621, provides:

Whoever– (1) having taken an oath before a competent tribunal,

17

officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter *which he does not believe to be true*; or (2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he *does not believe to be true*; is guilty of perjury . . .

18 U.S.C. § 1621 (emphases added). Importantly, the perjury statute specifically requires that the defendant have knowledge that the statement itself was not true. *See id.* The perjury statute is much more forgiving in its knowledge requirement than the elements delineated in 18 U.S.C. § 1503 for obstruction of justice. Notably, 18 U.S.C. § 1503 does not contain any comparable requirement of known falsity. Rather, the obstruction of justice statute merely requires that the defendant "*endeavor* [ ] to influence, intimidate, or impede any grand or petit juror . . ." 18 U.S.C. § 1503(a) (emphasis added). As the Supreme Court has articulated, "the term 'endeavor' . . . makes conduct punishable where the defendant acts with an intent to obstruct justice, and in a manner that is likely to obstruct justice, but is foiled in some way. . . ." *United States v. Aguilar*, 515 U.S. 593, 601-02 (1995). The obstruction of justice statute does not make a distinction between obstructive statements that are false and those that are evasive and not literally false. The

18

statute requires only that the defendant intend his statement to obstruct justice.

It is questionable whether the "literal truth" underpinnings of *Bronston* apply outside the confines of adversarial proceedings where opposing counsel are expected to continuously hone their questions to require definitive answers, and a judge is present to control uncooperative witnesses. In contrast, the grand jury is a non-adversarial, investigatory proceeding with no judge presiding. Moreover, Bonds was given immunity from prosecution in exchange for his testimony. *See United States v. Boskic*, 545 F.3d 69, 92 (1st Cir. 2008) (questioning "whether the literal truth defense as articulated in *Bronston* is appropriately invoked outside the context of adversary questioning. . . .").

In *Bronston*, the defendant's responses were literally truthful based on the specific questions posed. In other words, the questions in *Bronston* permitted the defendant to exploit the vagaries of the questions while still providing literally truthful answers. In contrast, the government in this case directly and unambiguously inquired of Bonds, "Did Greg ever give you anything that required a syringe to inject yourself with?" Bonds' answer that he was a celebrity child was literally truthful in only the most attenuated and superficial manner, as it had

nothing to do with the question asked.[2]  Unlike in *Bronston*, there were no nuances

to exploit in the direct question posed to Bonds.  In *United States v. Camper*, 384

F.3d 1073, 1076 (9th Cir. 2004), we recognized this limitation with respect to

*Bronston*. ("*Bronston's* rule is limited to cases in which the statement is

indisputably true, though misleading because it was unresponsive to the question

asked. . . .").  Unlike in *Bronston*, and considering his evasive and misleading

answer, the jury could have reasonably concluded that Bonds endeavored to

impede the grand jury's investigation.  *See United States v. Reilly*, 33 F.3d 1396,

1416 (3d Cir. 1994) ("Normally, it is for the petit jury to decide which construction

the defendant placed on the question. . . .") (citation omitted); *see also Griffin*, 589

F.2d at 204 ("[A]n obstruction of justice results when attempts to gather relevant

evidence by a judicial body, which is charged by law with the task of investigating

---

[2] Bonds' answer to the government's question as to whether Anderson "ever gave [him] anything that required a syringe to inject [himself] with" was not limited to Bonds' answer that he was a celebrity child.  Although it may be literally true that Bonds was a celebrity child, his answer was also coupled with the statement that he "just didn't get into other people's business because of [his] father's situation . . ."  To the extent the answer even addressed the government's direct question, it implied that, because he was a celebrity child, Bonds did not interject himself "into other people's business" and did not receive anything related to steroids from Anderson.  The jury could have reasonably concluded that the last part of Bonds' answer was an attempt to impede the grand jury's investigation by deflecting the question and evasively implying that, contrary to the evidence presented at trial, he did not know about Anderson's steroid operation because he did not get involved in the business of his friends.

and punishing crime, are frustrated by the use of corrupt or false means. The blatantly evasive witness achieves this effect as surely by erecting a screen of feigned forgetfulness as one who burns files or induces a potential witness to absent himself") (citation and internal quotation marks omitted); *United States v. Browning*, 630 F.2d 694, 699 (10th Cir. 1980) (holding that *Bronston*'s literal truth defense was inapplicable to an obstruction of justice offense because "*Bronston* involved a perjury prosecution in which the question was whether the defendant had told the truth. The ultimate question in the case at bar is not whether the defendant told the truth but whether the defendant obstructed or interfered with the process of truthfinding in an investigation in the process of enforcing the law").

"The function of the grand jury is to inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred. As a necessary consequence of its investigatory function, the grand jury paints with a broad brush. . . ." *United States v. R. Enter., Inc.*, 498 U.S. 292, 297 (1991) (citation omitted). Given the importance of the grand jury's investigative role, there is no reason to permit an immunized grand jury witness to obstruct the administration of justice by endeavoring to influence or impede the grand jury's investigation. It would appear that if there was ever a moment for a witness not to engage in obstructive testimony, it would be before a

21

grand jury.

Application of *Bronston*'s literal truth analysis guts the obstruction of justice provision prohibiting any attempt to "corruptly . . . endeavor to influence . . . or impede any grand or petit juror . . ." 18 U.S.C. § 1503(a). Equating obstruction of justice with perjury actually superimposes the heightened knowledge requirement contained in the perjury statute upon the "endeavor to influence or impede" provisions of the obstruction statute. 18 U.S.C. § 1503(a); *cf.* 18 U.S.C. § 1621(1). Specifically, *Bronston*'s requirement that an attorney must ask clarifying questions in order to cure potentially perjurious testimony should not be extended to a witness afforded immunity who attempts to obstruct a grand jury investigation through misleading and evasive answers. Bonds was liable for obstruction of justice at the moment he endeavored to influence or impede the grand jury's investigation with his misleading and evasive answer to the government's direct and unambiguous question. *See Aguilar*, 515 U.S. at 601 (holding that a defendant may be convicted of obstruction of justice "where the defendant acts with an intent to obstruct justice, but is foiled in some way"). In *Aguilar*, the Supreme Court delineated the dichotomy between perjury and the intent to obstruct justice:

> Were a defendant with the requisite intent to lie to a subpoenaed
> witness who is ultimately not called to testify, or who testifies but
> does not transmit the defendant's version of the story, the defendant

22

has endeavored to obstruct, but has not actually obstructed, justice. Under our approach, a jury could find such defendant guilty.

*Id.* As the Supreme Court emphasized, "[t]his is not to say that the defendant's actions need to be successful; an endeavor suffices . . ." *Id.* at 599 (citation omitted). Despite the jury's inability to unanimously find that Bonds committed perjury, the government presented sufficient evidence that Bonds' evasive answer interfered with the administration of justice. *See id.*

Once Bonds corruptly endeavored to impede the investigatory function of the grand jury, his crime was complete. *See Rasheed*, 663 F.2d at 853. Contrary to the views expressed in the concurring opinions, the obstruction cannot be undone by blaming the prosecutor for failing to prevent the obstruction. *See id.* ("[The prosecutor's] actions in no way negate the commission of the crime. At best, his relieving [the defendant] of further production indicates that justice was not, in fact, obstructed. This is not a defense. . . ."); *see also Perkins*, 748 F.2d at 1528 (observing that although the prosecutor could have questioned the witness more effectively, a reasonable jury could have nevertheless found the testimony to be evasive in an effort to obstruct justice).

None of the cases cited in the principal concurring opinion support the notion that there is insufficient evidence to sustain an obstruction of justice

conviction in this case, where the jury was instructed on materiality and specifically found that Bonds' statement obstructed justice. *See Thomas*, 612 F.3d at 1129 (upholding a conviction for obstruction of justice where the jury found materiality and obstructive statements); *cf. Kungys v. United States*, 485 U.S. 759, 769-70 (1988) (discussing generally concealment of a material fact in the denaturalization context); *United States v. McKenna*, 327 F.3d 830, 840 (9th Cir. 2003) (discussing materiality generally in the perjury context); *Weinstock v. United States*, 231 F.2d 699, 701 (D.C. Cir. 1956) (discussing materiality in the false statement context); *United States v. Serv. Deli Inc.*, 151 F.3d 938, 941 (9th Cir. 1998) (same); *United States v. McBane*, 433 F.3d 344, 350-51 (3d Cir. 2005) (same); *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007) (discussing materiality generally in the bank fraud context). To the extent that the principal concurring opinion cites these cases for the proposition that the grand jury function must be subject to influence for the obstruction conviction to stand, I disagree. *See, e.g. Aguilar*, 515 U.S. at 601 (explaining that a defendant may be convicted of obstruction of justice even if his attempt to obstruct is foiled). Moreover, the jury in this case was instructed on materiality and found Bonds' statement obstructive pursuant to that instruction. Absent a complete superimposition of the "literally true" *Bronston* analysis, the cases cited in the principal concurring opinion simply

24

do not provide a basis for reversing Bonds' conviction.

## Final Pitch

Barry Bonds received a grant of immunity in exchange for his truthful and candid testimony before the grand jury.  Rather than aiding the grand jury in its investigatory quest, Bonds elected to obstruct the grand jury process by giving evasive testimony.  There is sufficient evidence to support his conviction because the jury was instructed that it must find his evasive testimony to be material before rendering a guilty verdict.  In my view, the *per curiam* and concurring opinions impermissibly second-guess the jury verdict, disregard our precedent, create an unwarranted circuit split and import inapplicable principles from *Bronston* into the obstruction of justice analysis.  I cry foul.